**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**George W. BLOOD,**
**Defendant-Appellant.**

**No. 86–5554.**

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 6, 1986.

Decided Dec. 5, 1986.

R. Douglas Jones, Baltimore, Md., for appellant.

Katharine J. Armentrout, Asst. U.S. Atty. (Breckinridge L. Willcox, U.S. Atty., Catherine C. Blake, First Asst. U.S. Atty., Baltimore, Md., on brief), for appellee.

Before RUSSELL and WILKINS, Circuit Judges, and BUTZNER, Senior Circuit Judge.

WILKINS, Circuit Judge:

George W. Blood appeals his convictions on one count of embezzlement from an employee welfare benefit plan fund subject to the Employee Retirement Income Security Act of 1974 (ERISA), two counts of failure to file required ERISA reports, four counts of income tax evasion, and four counts of subscribing to false income tax returns. Blood asserts that the trial court erred in denying his motion for acquittal as to the ERISA counts because the government's proof affirmatively established that the fund at issue was not connected with an ERISA plan. Blood also contends that the trial court abused its discretion in refusing to admit as evidence questions pro-posed by the government on voir dire and remarks made by government counsel in opening statement which referred to the plans in question as "insurance." Finally, Blood argues that the trial court abused its discretion in admitting into evidence portions of a decision from a prior civil tax court case to which Blood was a party. We find no error and affirm.

I.

In 1975, Blood established Fortement Association, Inc. (Fortement) to market prepaid legal services plans (Plans) to employers and employee organizations, which then offered the plan to employees. For a set monthly fee ($8 to $12) which was collected by the sponsoring employer or employee organization and forwarded to Fortement, a Plan member was entitled to certain limited legal services from private attorneys who had contracted with Fortement to provide such services for a percentage of each member's dues. A percentage of the fee was also paid to management and marketing companies, owned and controlled by Blood, in exchange for promotional and administrative services provided to Fortement.

In 1978, Blood retained an attorney experienced in ERISA matters for the purpose of making sure that the Plans would comply with the requirements of ERISA. Additionally, Blood received an advisory opinion from the Department of Labor that one of the first Plans was a qualified ERISA plan.[1] The Plans were promoted and advertised as ERISA plans, and Blood testified that he believed that he was complying with ERISA.

Blood admitted that during 1980–1983, some attorneys were not paid the full amount due to them under their contracts with Fortement and the management and marketing companies were paid more than their contractual allocations. Corporate records revealed that various personal and familial expenses were paid on behalf of Blood by the management and marketing

---

1. Maryland General Hospital Group Legal Services Plan.

companies, either by direct payment or by payment through other corporations owned and controlled by Blood.

Fortement, as administrator of ERISA plans, was required to file annual financial reports for each Plan. A trust agreement with Maryland General Hospital provided that Fortement would assume full responsibility for meeting all the Department of Labor filing requirements under ERISA. Additionally, in January 1979, Blood assured the personnel director of Maryland General Hospital that Fortement would make all required filings under ERISA. No annual report was filed for the Maryland General Hospital Group Legal Services Plan for the 1979 or 1980 filing years.

Books and ledgers of the companies owned and controlled by Blood show that he received certain payments, advances, or loans from the companies throughout the years 1979–1982. Blood and his wife filed joint income tax returns for the years 1979–1982 which did not report the amount of such payments as income.

## II.

An ERISA employee welfare benefit plan is defined, in part, as:

[A]ny plan, fund, or program ... established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day-care centers, scholarship funds, or *prepaid legal services....*

29 U.S.C.A. § 1002 (West 1985) (emphasis added). A Department of Labor regulation provides that the term "employee welfare benefit plan" shall not include a group or group-type insurance program offered by an insurer to employees or members of an employee organization, under which:

(1) No contributions are made by an employer or employee organization;

(2) Participation [sic] the program is completely voluntary for employees or members;

(3) The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and

(4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

29 C.F.R. § 2510.3–1(j) (1985).

The government's ERISA expert testified on cross-examination that the Plans administered by Fortement met these four criteria; *i.e.,* no contributions were made by the employer or employee organization, participation was completely voluntary, the sole function of the sponsor was to publicize the program, collect fees, and remit them to Fortement, and the sponsors received no remuneration for administrative services. However, the expert further testified that the Plans were *not* excluded under the regulation, because they were not group insurance programs.

The issues concerning the motion for acquittal on the ERISA counts and the admissibility of the government's references to the Plans as "insurance" are intertwined. Blood argues that the government's reference to the Fortement Plans as "prepaid legal insurance plans" during opening statement and in written proposed voir dire questions submitted to the court, constituted a judicial, or at least an evidentiary, admission that the Plans were in fact "insurance." Therefore, Blood contends the testimony of the expert that the four criteria were satisfied, taken with the govern-

ment's admission that the Plans were insurance, affirmatively established, as a matter of law, that the Plans were not ERISA plans and the trial court erred in denying his motion for acquittal as to the ERISA counts.

In the proposed voir dire questions submitted by the government, Fortement was referred to as "a company in the business of providing prepaid legal insurance plans to various employee groups and credit unions such as the employees of the Maryland General Hospital." In opening statement, government counsel stated: "In this case Mr. Blood is charged with embezzlement, theft, or conversion, from a trust fund that was connected with a prepaid legal insurance plan under the name of Fortement." Several other references to "legal insurance plans" and "prepaid insurance plans" were made in the voir dire requests and opening statement.

The trial court found that the submission of the requests for voir dire was not an admission: "It is just a statement by the government. It doesn't mean anything.... Because they called it [an] insurance plan it doesn't make it one." The trial court appears to have also held that the government counsel's characterization of the Plans in opening statement was not evidence.

■ Generally, statements by an attorney concerning a matter within his employment may be admissible against the retaining client. *United States v. McKeon,* 738 F.2d 26, 30 (2d Cir.1984), *citing United States v. Margiotta,* 662 F.2d 131, 142 (2d Cir.1981). Further, a clear and unambiguous admission of fact made by a party's attorney in an opening statement in a civil or criminal case is binding upon the party. *McKeon, supra, citing Oscanyan v. Winchester Repeating Arms Co.,* 13 Otto 261, 263, 103 U.S. 261, 263, 26 L.Ed. 539 (1881).

We adopt the reasoning of the Second Circuit as expressed in *McKeon.*

■ In this case, the government did not make a clear and unambiguous admission that the Fortement Plans were insurance. To the contrary, it is clear that the government consistently maintained that the prepaid legal services plans were employee welfare benefit plans under ERISA. The use of the term "insurance" was merely an inadvertent use of the word, not an admission of fact.[2] Thus, the trial court did not abuse its discretion in refusing to treat the voir dire requests and opening statement as admissions.

Having found that the trial court did not err in ruling that the government had not admitted that the Fortement Plans were insurance, we turn to the issue of whether there was relevant evidence from which the jury could properly find beyond a reasonable doubt that Fortement's prepaid legal services plans were ERISA employee welfare benefit plans. Aside from the assertion that the government admitted that the Fortement Plans were insurance, Blood argues that once the four conditions of the regulation were met, it was established as a matter of law that the Plans were insurance plans not covered by ERISA. He contends that the regulation itself defines the conditions under which a plan will be excluded from ERISA as insurance and does not require a separate determination that the plan is insurance in order for it to be excluded. We find no merit to this argument.

■ The regulation provides that a *group or group-type insurance program* which meets the four listed criteria is excluded from ERISA coverage. 29 C.F.R. § 2510.3–1(j) (1985). A finding that a plan is a group or group-type insurance program is a predicate to application of the exclusion.

**2.** "A distinction is generally recognized between an attorney's judicial admissions, which, like any stipulation, can bind a party within a given lawsuit, and an attorney's less formal evidentiary admissions, which are statements made as a party's agent and which the trier of fact may

evaluate as it sees fit." *McKeon,* 738 F.2d at 30 n. 3, *citing* Note, *Judicial Admissions,* 64 Colum. L.Rev. 1121 (1969). Having found that there was no admission of any kind, we do not address the possible distinctions.

■ In its case in chief, the government presented expert testimony that the Fortement Plans were ERISA plans and not insurance. Thus, the exclusion did not apply.[3] Clearly, the testimony of the expert was sufficient relevant evidence from which the jury could properly find beyond a reasonable doubt that Fortement's Plans were covered by ERISA.[4] Therefore, the trial court did not err in denying Blood's motion for judgment of acquittal on the ERISA counts. Rather, the counts were properly submitted to the jury with instructions on the statutory definition of an employee welfare benefit plan under ERISA and the exclusion available under the regulation.

### III.

An essential element of the crimes of tax evasion and subscription to a false tax return is willfulness. In order to meet its burden of proof as to the intent issue and to show a continued pattern of tax avoidance, the government sought to introduce, under Federal Rule of Evidence 404(b), evidence of Blood's prior tax dealings—specifically, a 1976 tax court decision to which Blood was a party. *George Blood Enterprises, Inc. v. Commissioner; George W. Blood and JoAnn Blood v. Commissioner,* 35 T.C.M. (CCH) 33,743(M) (1976). The tax court held that payments made to Blood or for his personal benefit during 1967–1970 by a corporation solely owned and controlled by him were not bona fide loans, but unreported taxable dividend income.

The trial court allowed the IRS special agent to read into the record limited portions of the 1976 tax court decision concerning issues similar to those which were before it and gave proper limiting instructions on the use of such evidence. Blood argues that the trial court committed reversible error in admitting the portions of the tax court decision because the government allegedly made no effort to establish that Blood received or read the actual decision. We find no abuse of discretion by the trial court.

■ Blood testified that he represented himself in the prior tax court proceedings and also gave testimony. He further testified that the first time he ever saw the tax decision was when his attorney gave it to him sometime after he had been indicted in this case. However, he did admit that he knew the tax court had ruled against him and his wife and "passed all the income to me." The fact that he acted *pro se* and he knew the final outcome of the tax court case is sufficient to establish the necessary foundation for admission of the decision under Rule 404(b).

■ Additionally, the decision was admissible under Federal Rule of Evidence 705 as an underlying basis in support of the agent's expert opinion. Blood's actual receipt or possession of the decision is not a necessary foundation to admission of the decision under Rule 705.

Accordingly, the convictions are affirmed on all counts.

AFFIRMED.

---

3. We also note that on cross-examination, Blood testified that a contingent liability on the insuring company "is one of the criteria for something being called insurance," and he admitted that there is not contingent liability on Fortement.

4. Counsel for Blood conceded in oral argument that without the admissions of the government that the plans were insurance, there was sufficient evidence to send the case to the jury.