Mike CURB d/b/a Curb Music Company, and Curb Records, Inc., a Tennessee corporation, Plaintiff,

v.

MCA RECORDS, INC., a California Corporation, Defendant.

MCA RECORDS, INC., Plaintiff,

v.

Mike CURB d/b/a Curb Music Company, and Curb Records, Inc., Defendants.

Nos. 3:93–0215, 3:93–0420.

United States District Court, M.D. Tennessee, Nashville Division.

Sept. 28, 1995.

Aubrey B. Harwell, Ronald G. Harris, George H. Cate, III, Neal & Harwell, Nashville, TN, William Howard Tate, Gracey, Ruth, Howard, Tate & Sowell, Nashville, TN, Joel R. Strote, Woodland Hills, CA, Robert L. Sullivan, Manatt, Phelps & Phillips, Nashville, TN, for Mike Curb in No. 3:93–0215.

Philip Michael Kirkpatrick, Alan T. Fister, Stewart, Estes & Donnell, Nashville, TN, Stephen F. Moeller, Donald S. Engel, Engel & Engel, Los Angeles, CA, for MCA Records, Inc.

Aubrey B. Harwell, Ronald G. Harris, Neal & Harwell, Nashville, TN, Joel R. Strote, Woodland Hills, CA, Marc Marmaro, Elizabeth Barrowman, Jeffer, Mangels, Butler & Marmaro, Los Angeles, CA, Robert L. Sullivan, Manatt, Phelps & Phillips, Nashville, TN, for Curb Music Co. in No. 3:93–0420.

Joel R. Strote, Woodland Hills, CA, Marc Marmaro, Elizabeth Barrowman, Jeffer,

Mangels, Butler & Marmaro, Los Angeles, CA, for Does 1 Through 10.

## MEMORANDUM AND OPINION

WISEMAN, District Judge.

This dispute between Mike Curb d/b/a Curb Music Co. and MCA Records, Inc., arises out of a joint venture between the parties gone sour. MCA has moved for partial summary judgment on a question involving ownership of several master recordings produced by the musical duo, "The Judds." Curb has moved for judgment on the pleadings or, in the alternative, summary judgment on MCA's counterclaim that Curb infringed MCA's copyrights in other sound recordings by sub-licensing them overseas.

Amid acrid disagreement over several ancillary discovery disputes, the Court heard oral argument on these motions September 19, 1995, and issued orders accordingly from the bench. This opinion more fully sets out the Court's reasoning.

## I. MCA'S SUMMARY JUDGMENT MOTION

### A. THE DISPUTE

During the 1980s, Naomi and Wynonna Judd recorded 67 songs for RCA Records, Inc., as "The Judds." Many of these recordings were and are tremendously popular with country music audiences. That these parties have waged such protracted litigation is evidence enough of the recordings' continued commercial viability.

Though songwriters' publishing companies and others hold copyrights in the musical works, the rights in the physical embodiment of those works—the master recordings produced in the RCA studios—is the subject of the Defendant's motion for partial summary judgment.

Defendant MCA Records, Inc., claims that after Feb. 2, 1996, when a subsidiary of Capitol Records loses its interest in the former RCA masters, a joint venture of MCA and Plaintiff Mike Curb d/b/a Curb Music Co., will own them exclusively. MCA's claim under the joint venture agreement and other agreements with Curb would provide MCA with lucrative exclusive rights to control the Judds masters' commercial destiny.

Curb maintains the Judds masters will not, however, automatically become exclusive property of the Curb/MCA venture. Rather, Curb asserts that the Judds masters will be his property when their rights revert to Curb from the Capitol subsidiary. Curb claims that the agreements to which MCA points are void for lack of consideration and MCA's bad faith in their formation. In any event, Curb argues that MCA has failed to meet the requisite burden of proof on its summary judgment claim to the contrary.

### B. THE UNDISPUTED FACTS

Many of the salient facts underlying MCA's motion are undisputed by the parties.

In September 1983, Curb and MCA began a joint venture by entering into an Independent Production and License Agreement ("Venture Agreement"), under which the two companies have jointly produced record masters by a variety of artists. Under the Venture Agreement, MCA has sole right throughout the United States, Canada, and the United Kingdom

> to manufacture, advertise, publicize, sell, lease, license, or otherwise use or dispose of and exploit records and/or derivatives manufactured from the Masters ... and to permit others to do so ... or to refrain therefrom, subject to the terms of this Agreement, in MCA's sole discretion.

Def. Ex. 1 ¶ 7(b).

MCA's exclusive rights are limited. The agreement defines "Masters" as "any master or master recording embodying the performances of an Artist which are recorded during the Presentation Term and/or the Artist Term ... hereunder." *Id.* at ¶ 17(b). Elsewhere in the Venture Agreement, Curb represents that "Masters recorded prior to the execution [of the Venture Agreement] will be deemed to have been recorded during the applicable Artist Term...." *Id.* at ¶ 1(h).

Apart from the MCA venture, Curb produced Judds' records through most of the 1980s under a separate agreement with RCA Records (now BMG, Inc.). When that con-

tract expired, Wynonna and Naomi signed a deal in June 1988 (the "Judds Addition Agreement"), making new Judds masters property of the Curb/MCA Joint Venture.

Curb and MCA have not been peaceable partners. Prompted in 1992 by other business concerns—the renegotiation of Curb's contract with venture artist Lyle Lovett and the negotiation for the rights to Lovett's and Wynonna Judd's recordings in a movie soundtrack—Curb and MCA began difficult and protracted negotiations to resolve their differences and enter into a new Venture Agreement.

Meanwhile, older Judds recordings continued to sell. Despite the Venture Agreement provision that previously recorded masters of Venture artists "will be deemed to have been recorded during the applicable Artist Term," Curb acted as though it held exclusive rights in the old Curb/BMG master recordings (the "Judds Masters"). Curb transferred distribution rights in the Judds Masters to a subsidiary of Capitol Records ("CEMA"). The CEMA agreement provided that, upon its expiration, the Judds Masters distribution rights would revert to Curb. The CEMA agreement expired in December 1994; the Judds Masters distribution rights revert to Curb on February 2, 1996.

## C. THE DISPUTED FACTS

There are essentially two significant factual disputes, though, as is made clear below, the answer to the latter question renders the former moot.

1. When the Judds Masters rights revert to Curb in February 1996, do they, by force of the Judds Addition Agreement and the definition of "Masters" in the Venture Agreement, become property of the Curb/MCA venture, subject to MCA's exclusive rights?

2. Even assuming the answer to question 1 is no, did Curb nonetheless transfer its rights to the Curb/MCA venture during its 1992 negotiations with MCA?

It is undisputed that on October 26, 1992, Curb and MCA representatives signed what has become known as the "Leap of Faith Agreement," named for the movie whose soundtrack was at the heart of the talks

between the parties. The Leap of Faith Agreement dealt with many issues irrelevant to this litigation. It contained one entirely relevant paragraph:

> You [Curb] and we [MCA] have a disagreement regarding the disposition of the so-called Judds/BMG Masters. MCA contends that when the Judds/BMG Masters initially revert to Curb, the exclusive rights to exploit the Judds/BMG Masters in the form of existing albums or otherwise are immediately transferred to the MCA/Curb venture. Curb contends that if the term of its current distribution agreement with CEMA is then in effect, upon such reversion such rights are transferred to its distribution agreement with CEMA, subject to certain non-exclusive licensing rights in the Judds/BMG masters to the MCA/Curb venture.... *Curb agrees that if and when the term of Curb's current distribution agreement with CEMA is not in effect and the Judds/BMG Masters have reverted to Curb, then at such time, the MCA/Curb venture will have the exclusive right to exploit the Judds/BMG Masters under the same terms as apply to Wynonna Judd masters.*

Leap of Faith Agreement ¶ 2 (emphasis added).

The interpretation of this single paragraph and the actions taken therefrom are the heart of the matter. Given that Curb's contract with CEMA expired in 1994 and the date for the Judds Masters to revert to Curb is set, MCA claims this provision is dispositive. Curb claims the Leap of Faith Agreement was an inducement to persuade MCA to rewrite the venture agreement, merely a step in the 1992 negotiations. Curb argues that agreement on a new venture is a condition subsequent to the enforceability of the Leap of Faith terms regarding the Judds Masters.

## D. LAW AND ARGUMENT

While Curb's agreement with CEMA was extant, Curb consistently represented to this Court that the Leap of Faith Agreement spoke for itself, that an expiration of the CEMA contract would result in a reversion

of the Judds Masters to the MCA/Curb venture. Then, when the CEMA deal actually expired, Curb changed course and argued against its previous position.

At best, this was poor foresight. At worst, it amounts to misrepresentation. At law, it is a binding judicial admission, sufficient to merit summary judgment in behalf of MCA.

### 1. Summary judgment standard

■ Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1476–1480 (6th Cir.1989). The party seeking summary judgment bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552. In responding to a motion for summary judgment, the nonmoving party cannot rest on its pleadings, but must present some "specific facts showing that there is a genuine issue for trial." *Id.*

■ The Supreme Court concluded in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), that a dispute about a material fact is "genuine" within the meaning of Fed.R.Civ.P. 56 only if "the evidence is such that a reasonable jury could. return a verdict for the nonmoving party." 477 U.S. at 248, 106 S.Ct. at 2510. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient." 477 U.S. at 252, 106 S.Ct. at 2512. Of course, the court is to construe the evidence and all inferences to be drawn from it in the light most favorable to the nonmoving party. 477 U.S. at 255, 106 S.Ct. at 2513.

### 2. Judicial admissions

■■ Admissions or statements a party makes in the course of litigation bind that party upon a motion for summary judgment. *Ferguson v. Neighborhood Housing Services*

*of Cleveland, Inc.,* 780 F.2d 549 (1986).[1] The *Ferguson* court explained the wisdom and impact of binding parties to their pre-trial admissions:

> Judicial admissions "eliminate the need for evidence on the subject matter of the admission," as admitted facts are no longer at issue.... · This court has observed that "[u]nder federal law, stipulations and admissions in the pleadings are generally binding on the parties and the Court." Not only are such admissions and stipulations binding before the trial court, but they are binding on appeal as well.

*Id.* at 550–51 (citations omitted); *see also Missouri Housing Dev. Comm'n v. Brice,* 919 F.2d 1306, 1315 (8th Cir.1990) (holding that "admissions in the pleadings are binding on the parties and may support summary judgment against the party making such admissions").

The admissions at issue before the Court are contained in Curb's complaint and its amended complaint and in an oral appearance before the Court. Curb asserted in its original complaint:

> 28. An actual controversy has arisen and now exists between Curb and MCA concerning certain of the parties' respective rights and duties under the Venture Agreement. Curb contends as follows:

> .    .    .    .    .

> (c) That pursuant to the terms of an agreement between Curb and [BMG] and upon reversion to Curb of master recordings embodying the performances of the Judds ... Curb shall have sole rights to distribute and exploit the BMG masters, subject to only certain non-exclusive rights of the Venture. *MCA and Curb have agreed that if at the time the BMG Masters revert to Curb, Curb's current distribution agreement with CEMA is not in effect, the exclusive rights to such Masters will go to the Venture....*

---

1. At least five other circuits have adopted the same rule. *See Schott Motorcycle Supply, Inc. v. American Honda Motor Co., Inc.,* 976 F.2d 58, 61 (1st Cir.1992); *Bright v. QSP, Inc.,* 20 F.3d 1300, 1305 (4th Cir.1994); *Campbell v. Sonat Offshore*

*Drilling, Inc.,* 979 F.2d 1115, 1119 (5th Cir. 1992); *Missouri Hous. Dev. Comm'n v. Brice,* 919 F.2d 1306, 1315 (8th Cir.1990); *Nat'l Ass'n of Life Underwriters, Inc. v. Commissioner of Internal Revenue,* 30 F.3d 1526, 1530 (D.C.Cir.1994).

Curb Complaint at 10–11 (Mar. 18, 1993); Curb Amended Complaint at ¶ 31.

Additionally, in a hearing before this Court on September 6, 1994, the following exchange occurred between the Court and Robert L. Sullivan, Jr., one of Curb's myriad attorneys:

> THE COURT: I will hear you, Mr. Sullivan, about your protective order.

> MR. SULLIVAN: Judge, I think what we would like to propose first of all is that there probably are a couple different categories or levels of confidentiality of these documents.

> We believe, Judge, that the CEMA documents and that the documents relating to the Atlantic Records' deal absolutely are highly confidential, particularly the Atlantic Records' deal.

> I am advised there is nothing in the Atlantic Records' deal that has anything to do with the Judds' masters. Mr. Curb did not go to Atlantic and offer them the Judds' master.

> *Mr. Curb's position has always been if Capital's deal is in effect, Capital gets them; Capital's deal is not in effect, they go to the Venture. That issue may end up being moot. There are negotiations going on.*

> I am advised that there is nothing in the Atlantic deal about that....

Transcript of Hearing before the District Court at 94–95 (Sept. 6, 1994).

The Sixth Circuit has determined that oral representations by counsel in the course of litigation constitute binding judicial admissions. *Berlin v. The Celotex Corp.*, 912 F.2d 465, 1990 WL 125360 (6th Cir., 1990) (unpublished opinion available in WESTLAW CTA–6 database). In *Berlin*, the court of appeals upheld a directed verdict by Judge Higgins of the Middle District based, in part, upon counsel's concession of an issue during opening argument of trial. *See also Oscanyan v. Arms Co.*, 103 U.S. (13 Otto) 261, 26 L.Ed. 539 (1880) (giving binding effect to arguments of counsel before a trial court); *United States v. McKeon*, 738 F.2d 26, 30 (2d Cir.1984); *United States v. Blood*, 806 F.2d 1218 (4th Cir.1986).

Curb's admissions, both oral and written, are clear and unadulterated by context. Curb's argument that this Court ought not bind him to these statements are equally unconvincing.

In response to MCA's statement of material fact that Curb admitted the reversion of the Judds Masters to the Venture, Curb simply reiterates its argument that the Leap of Faith Agreement's enforceability was conditioned on MCA's reworking the Venture Agreement. This seeks to avoid the question by attempting to divert the Court's focus from the admissions to a substantive issue of contract interpretation. Assuming for a moment that Curb stated unadulterated truth, that the Leap of Faith provision was orally conditioned on a larger agreement and that MCA knew it, Curb's response would still fail to explain why it said what it did in its pleadings and before this Court. Such evasiveness only underscores *Ferguson's* observation that judicial admissions must bind parties in order to ensure that counsel plead their case in good faith. *Ferguson*, 780 F.2d at 551.

The Court notes that while Curb executives have submitted numerous affidavits from Curb employees and family members alleging oral promises by MCA to remake the Venture Agreement, they have failed to produce any items from the voluminous 1992 correspondence between the parties to support the existence of such an agreement. While the music industry may occasionally function on a handshake and a smile, these parties stopped grinning and embracing long ago. It is unreasonable to expect, though this is Curb's position, that the terms of such a dispute potentially involving millions of dollars between two commercially sophisticated parties would be resolved by elevator chatter after a long night of negotiations and not reduced to writing at some point, even by confirmatory memorandum from Curb. "Even assuming the plaintiff had sufficiently pled an oral contract, the alleged representations seem scarcely sufficient to form the basis for a valid oral contract. At best they seem to be expressions of opinion or predictions as to future events, not promises that could form an offer." *Schott Motorcycle*

*Supply v. American Honda Motor Co.,* 976 F.2d 58, 62 n. 1 (1st Cir.1992) (binding plaintiff to judicial admissions in pleadings).

While this evidence is more precisely relevant to a substantive interpretation, it nonetheless supports MCA's suggestion that Curb, confronted with the apparently unexpected loss of the CEMA contract in late 1994, changed its story in mid–1995. This is exactly what *Ferguson* and the doctrine of judicial admissions seeks to prevent.

Therefore, the Court GRANTS MCA's motion for partial summary judgment and orders that the Judds Masters will become exclusive property of the Curb/MCA joint venture on Feb. 2, 1996, subject to the terms of the 1983 Venture Agreement between the parties.

## II. CURB'S MOTION FOR JUDGMENT ON THE PLEADINGS

### A. THE FACTS

Apart from the Joint Venture, MCA agreed in 1990 to license some of its master recordings ("the Licensing Agreement") by a variety of artists to Curb for distribution in the United States, Canada and the United Kingdom ("the Territory"). The licensing agreement, including a variety of older recordings by such diverse artists as Bing Crosby (including "White Christmas"), Gladys Knight, Debbie Reynolds, and Conway Twitty, permitted Curb to release the recordings in the Territory. The License Agreement, however, did not provide Curb authority to release the recordings in any other country, except by permission of WEA (Warner/Elektra/Asylum), MCA's worldwide licensee.

In February 1991, Curb asked WEA for permission to sub-license some of the MCA recordings outside the Territory. A February 14, 1991, response from WEA indicated that its agreement with MCA expired in March 1991 and that any approval it might give would be irrelevant; the response referred Curb to MCA for approval. Subsequently, Curb entered into contracts to license recordings to sublicensees around the world, including Japan, Finland, Malaysia, Austria, South Africa, and Hong Kong.

MCA claims that some of the recordings included in the 1990 Licensing Agreement made its way onto tapes and albums overseas via Curb's contracts with its foreign sublicensees. Curb does not appear to challenge this assertion.

The only fact apparently in dispute is whether the Licensing Agreement required Curb to get *anyone's* approval for worldwide release of the recordings once WEA's agency with MCA expired in March 1991. Curb claims it needed no further authority. MCA claims that WEA put Curb on notice that a change was in the works in MCA's licensing agreements and that, in fact, BMG replaced WEA as MCA's worldwide licensee in 1991. MCA claims Curb needed BMG's approval to release the recordings outside the Territory.

In its amended counter-claim, MCA has sued Curb under the Licensing Agreement alleging copyright infringement, unfair competition, conversion and intentional interference with present and prospective economic advantage. Amended Counterclaim of Def. ¶ 27.

Curb now moves for a judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c) or, in the alternative, summary judgment.

### B. THE EXTRATERRITORIAL APPLICATION OF U.S. COPYRIGHT LAW

Relying on a recent holding by the Ninth Circuit Court of Appeals, Curb argues that he is entitled to judgment on the pleadings because, he asserts, U.S. law does not apply to overseas acts that, if done in this country, would constitute infringement of a copyright owner's exclusive rights under 17 U.S.C. § 106.

#### 1. Judgment on the pleadings/Summary judgment

Fed.R.Civ.P. 12(c) provides

After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as

one for summary judgment and disposed of as provided for in Rule 56. . . .

■ The Sixth Circuit has held that when a party moves for judgment on the pleadings, "all well-pleaded allegations must be taken as true." *Dynamic Construction Co., Inc. v. Village of Archbold,* 61 F.3d 903, 1995 WL 418294 (6th Cir.1995) (unpublished decision quoting *Southern Ohio Bank v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 479 F.2d 478, 480 (6th Cir.1973)). "The motion is granted when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law." *Paskvan v. Cleveland Civil Service Comm'n,* 946 F.2d 1233, 1235 (6th Cir.1991).

Though Curb moved under Rule 12(c) for judgment on the pleadings, it also submitted affidavits and exhibits in support of its motion. According to the rule, this invokes Curb's alternative pleading for summary judgment.[2] Therefore, it appears the Court should judge this claim under the summary judgment standard set out above in the discussion of MCA's partial summary judgment motion.

### 2. *Subafilms,* authorization, and the Copyright Act

■ Curb argues that it did nothing more than sign contracts with entities abroad to distribute copies of sound recordings in which Curb held a license to reproduce. Curb's argument at law is this: Even assuming that such an action violated U.S. copyright law, such illegality is beyond the reach of this Court. There is recent precedent outside the Sixth Circuit that bears examination.[3] In *Subafilms, Ltd. v. MGM–Pathe Communications Co.,* 24 F.3d 1088 (9th Cir. 1994), the Ninth Circuit addressed itself to the "vexing question of whether a claim for infringement . . . can be brought under the Copyright Act . . . when the assertedly infringing conduct consists solely of the authorization within the territorial boundaries of

the United States of acts that occur entirely abroad." *Id.* at 1089 (citations omitted).

*Subafilms* holds that "such allegations do not state a claim for relief under the copyright laws of the United States." *Id.; see also United Dictionary v. G & C Merriam Co.,* 208 U.S. 260, 264–66, 28 S.Ct. 290, 290–91, 52 L.Ed. 478 (1908) (holding, under the 1905 Copyright Act, that an omission of copyright notice on works published overseas was not an infringement); *EEOC v. Arabian American Oil Co. (ARAMCO),* 499 U.S. 244, 248, 111 S.Ct. 1227, 1230, 113 L.Ed.2d 274 (1991) (noting presumption that U.S. law has no extraterritorial application). In *Subafilms,* the plaintiffs sued MGM, Warner Brothers, and their subsidiaries, claiming they violated Subafilms' copyright in the Beatles movie, "Yellow Submarine" by distributing video versions both domestically and abroad. *Id.* A trial court awarded the plaintiffs $2.2 million in damages, finding infringement by the distribution of the video in the United States and by the authorization of distribution worldwide. *Id.* A panel of the Ninth Circuit affirmed, relying upon the circuit's previous holding in *Peter Starr Production Co. v. Twin Continental Films, Inc.,* 783 F.2d 1440, 1442–43 (9th Cir.1986). On rehearing en banc, the Circuit overruled *Peter Starr* "insofar as it held that allegations of an authorization within the United States of infringing acts that take place entirely abroad state a claim for infringement under the Act." *Id.* at 1090.

Early commentators suggest that *Subafilms* opens the door to massive foreign infringement of American cultural works, a devastating blow considering the worldwide popularity of U.S. films, books, videos and music. *See generally* Michael W. Ballance, Note, *Third–Party Innocence: Domestic Authorization of Foreign Copyright Infringement and Subafilms, Ltd. v. MGM–Pathe Communications Co.,* 20 N.C. J. Int'l L. & Com. Reg. 435 (1995). The key, however, to understanding *Subafilms'* applicability to this

**2.** Though, for reasons that should be clear below, the result doesn't differ substantively either way. Taking MCA's allegations of infringement as true, as the Court must under Rule 12(c), Curb has failed to show that no material issue remains with respect to the most important factual question in *Subafilms* and international copyright law—the location of the allegedly infringing acts.

**3.** Research finds no case within the Sixth Circuit deciding or discussing this issue.

case is to break down what it stands for and what it does not.

First, *Subafilms* relies upon a peculiar interpretation of the scope and nature of the authorization right in 17 U.S.C. § 106. This interpretation, tying the authorization right solely to a claim of justiciable contributory infringement appears contrary both to well-reasoned precedent, statutory text, and legislative history.

Even if the Court accepted *Subafilms'* interpretation lashing the § 106 authorization right solely to claims of contributory infringement, however, a critical question remains: Is there any primary infringement? MCA argues there is. *Subafilms* emphasizes at several points that its holding goes only to the application of the Copyright Act against defendants who have committed no primary acts of infringement in the United States. *See, e.g., Subafilms,* 24 F.3d at 1099 (expressing no opinion on copyright holder's argument that an act of domestic infringement—reproducing the film—made damages for foreign infringement appropriate). Therefore, in order for Curb to obtain summary judgment on this issue, it must show there is no issue as to this most material fact.

This threshold question may be called "localizing infringement." Paul E. Geller & Melville B. Nimmer, eds., 1 *International Copyright Law and Practice,* Intr. § 3[b][i] (6th ed. 1994) ("Geller & Nimmer"). "More generally, in dealing with transborder conduct, it is advisable to analyze it down into discrete component acts country by country, before asking which law or laws should apply to which acts." *Id.* at INT–46. Simply put, the Court must determine whether an act of copyright infringement occurred within the boundaries of the United States. For if it did, even *Subafilms* concedes that further extraterritorial acts will not thwart a U.S. court's jurisdiction. *Subafilms,* 24 F.3d at 1094.

The Copyright Act defines infringement in two sections. "Anyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 118 ... is an infringer of the copyright...." 17 U.S.C. § 501(a). Section 106 provides a copyright holder the exclusive rights *to do and to authorize* any of the following:

(1) to reproduce the copyrighted work in copies or phonorecords;

. . . .

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

17 U.S.C. § 106 (emphasis added).

In this case, MCA indisputably held copyrights in the sound recordings at issue, *see* 17 U.S.C. § 102(a)(7). By the Licensing Agreement, MCA authorized Curb to reproduce and distribute copies of the recordings in the United States, Canada, and the United Kingdom.

MCA argues that when Curb expanded the market for these recordings to other countries, it infringed upon at least three of MCA's exclusive rights: reproduction, distribution, and authorization. If MCA can "present affirmative evidence" showing that genuine issues of material fact exist as to any of these allegations, it defeats Curb's motion. *Street,* 886 F.2d at 1479.

The first question—one of reproduction—is precisely the question the *Subafilms* court avoided. *Subafilms,* 24 F.3d at 1099. A famous illustrative answer is found in *Sheldon v. Metro–Goldwyn Pictures Corp.,* 106 F.2d 45 (2d Cir.1939), in which Judge Learned Hand wrote that an illicit lifting of copyright owner's play in this country gave rise to damages for distribution of the derivative film work overseas. *Id.* at 52.

MCA has produced copies of Curb's sublicensing agreements with entities in Hong Kong, Japan, and Australia. Each agreement required Curb to deliver duplicate master recordings to facilitate their reproduction. *See* MCA exh. 3 (including contracts with distributors in Japan and Australia and a "Foreign Contract Summary" for Hong Kong, Singapore, Malaysia, Taiwan, Thailand, Philippines, and South Korea). Curb's unauthorized creation of duplicate master tapes for release into these countries would appear to amount to an infringement of MCA's reproduction right.

Curb responds that the Licensing Agreement permitted Curb to reproduce the recordings anyway. However, the Licensing Agreement clearly restricts Curb's rights to the United States, Canada, and the United Kingdom. If Curb's argument were valid, it could make as many copies of MCA's recordings as it wished, so long as the copies were not used for infringing purposes. While this argument sounds fine at first blush, it is undercut by its own faulty premise: Why would any copyright holder authorize reproduction for the domestic market when such a transfer could lead to unsanctionable reproduction for wholesale distribution in foreign markets?

■ Curb's reproduction of the masters, if it occurred (and it did unless Curb shipped its only copy in a circuit from foreign distributor to distributor), for distribution into unauthorized territory, therefore amounts to a primary infringement of MCA's exclusive rights. 17 U.S.C. §§ 106(1), 501. Curb has not shown that no genuine issue of material fact exists as to its reproduction; indeed, it appears even to concede it.[4]

■ *Subafilms* does, however, speak to the scope and extent of MCA's authorization right. *Subafilms* holds that § 106's authorization right is implicated only in cases of contributory infringement. *Subafilms*, 24 F.3d at 1094. When no primary infringer is reachable by U.S. copyright law, either because the conduct falls short of infringement or because infringing conduct occurs outside the United States, the Ninth Circuit will not find the person who authorized the conduct liable. "In both cases, the authorized conduct could not violate the exclusive rights guaranteed by section 106. In both cases, therefore, there can be no liability for 'authorizing' such conduct." *Id.*

The Ninth Circuit rejected the argument that the 1978 addition of the words "to authorize" in § 106 created an independent right, just as the words "to do" do. Instead, *Subafilms* holds that "to authorize" merely codifies the doctrine of contributory infringement. *Id.* at 1092–93. ·*Subafilms*, thus, reads the authorization right out of the Act in cases of foreign infringement.

But piracy has changed since the Barbary days. Today, the raider need not grab the bounty with his own hands; he need only transmit his go-ahead by wire or telefax to start the presses in a distant land. *Subafilms* ignores this economic reality, and the economic incentives underpinning the Copyright Clause designed to encourage creation of new works, and transforms infringement of the authorization right into a requirement of domestic presence by a primary infringer. Under this view, a phone call to Nebraska results in liability; the same phone call to France results in riches. In a global marketplace, it is literally a distinction without a difference. ·

A better view, one supported by the text, the precedents, and, ironically enough, the legislative history to which the *Subafilms* court cited, would be to hold that domestic violation of the authorization right is an infringement, sanctionable under the Copyright Act, whenever the authorizee has committed an act that would violate the copyright owner's § 106 rights.

This was the approach taken by the court in *ITSI T.V. Productions v. California Authority of Racing Fairs*, 785 F.Supp. 854 (E.D.Cal.1992). Faced with domestic authorization of infringing closed-circuit TV broadcasts in Mexico, the court found that sections 106 and 501 establish a direct cause of action for illegal authorizations under the Copyright Act. *Id.* at 859–60. The court held that the location of the authorized act is irrelevant, so

---

**4.** [E]ven assuming *arguendo* that Curb did duplicate MCA–licensed product in the United States, MCA concedes that Curb is licensed to do so pursuant to the license agreement between the parties. While MCA concedes this fact, it argues that such duplication in the United States if coupled with shipment to a Curb licensee outside of the United States, Canada or the United Kingdom would give rise to a cause of action under United States Copy-

right Laws, notwithstanding that the alleged infringing act is occurring outside of the United States. Again, assuming *arguendo* the facts set forth by MCA are true, MCA cites no authority, statutory or otherwise, for its position. This is because there is none.

Reply of Curb to MCA's Response at 203 (Sept. 15, 1995). Curb's last statement is patently untrue. The authority is the Copyright Act, 17 U.S.C. §§ 106, 501.

long as it is the sort of activity that infringes upon a copyright owner's exclusive 106 rights. *Id.* at 863. Other courts agree. "[T]here may be many reasons why a party may not be held accountable for its conduct in court. What is important is that contributory infringement be hinged upon an act of primary infringement, even if the primary infringer for some reason escapes judicial scrutiny." *Danjaq, S.A. v. MGM/UA Communications Co.,* 773 F.Supp. 194 (C.D.Cal. 1991).

The legislative history, though brief, is also illustrative:

> Use of the phrase "to authorize" is intended to avoid any questions as to the liability of contributory infringers. For example, a person who lawfully acquires an authorized copy of a motion picture would be an infringer if he or she engages in the business of renting it to others for purposes of unauthorized public performance.

H.R.Rep. No. 1476, 94th Cong., 2d Sess. 61, *reprinted in* 1976 U.S.C.C.A.N. 5659, 5674. *See Subafilms,* 24 F.3d at 1093 (citing this language).

In this case, even taking Curb's argument that it lawfully acquired and reproduced copies of MCA's sound recordings as true, the act of authorizing the distribution of the recordings for sale to a worldwide public seems equally sanctionable under sections 106 and 501. That Curb authorized these sales does not appear to be in dispute. MCA's production of letters raising the overseas sales as issues with Curb executives are unchallenged by Curb's insistence upon *Subafilms* as its sole shield.

The Court is sensitive to the sovereignty and rule of law in other countries. Such sensitivity is only enhanced by the recognition of the United States' obligation under multilateral treaties such as the 1971 Geneva Phonograms Convention and the recently adopted TRIPS component of the General Agreement on Tariffs and Trade. However, a careful exercise of domestic jurisdiction is consistent with the approach of the leading treatise in the field of international copyright law:

> A U.S. court, for example, could grant injunctive remedies under U.S. law for acts that commence a course of infringing conduct in the United States, for example, acts of authorizing or copying, without regard for whether eventual exploitation is to take place at home or abroad. Such an injunction would be justifiable if it forestalled piracy, whether at home or abroad, but did not risk interfering with such relief as might be granted under foreign laws for exploitation abroad.

Geller & Nimmer, *supra,* § 3[b][ii] at INT–51–52.

Because, therefore, issues of fact remain with regard to domestic infringement and authorization, the Court need not reach the question of whether domestic or foreign law may be applied to ultimately resolve the question of infringement. Curb's motion is disposed of simply by reference to *Street's* summary judgment standard: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Street,* 886 F.2d at 1479. Given the facts at hand and the law as it exists, *Subafilms* notwithstanding, the Court must DENY Curb's motion for summary judgment.

It is so ORDERED.