PER CURIAM.
|tThe state charged defendant by grand jury indictment with second degree murder in violation of La.R.S. 14:30.1 following the shooting death of her live-in boyfriend/husband. After trial by jury, defendant was found guilty as charged. The trial court sentenced her to the mandatory term of life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. On appeal, the Third Circuit reversed defendant’s conviction and sentence on grounds that the evidence presented at trial did not support her conviction for second degree murder and would not support a judgment of guilt on the lesser included and responsive offenses of manslaughter and negligent homicide. State v. Trahan, 11-148, p. 13 (La.App. 3 Cir. 7/6/11), 69 So.3d 1240, 1248. The court of appeal accordingly ordered defendant acquitted. We granted the state’s application for review and reverse the decision below for reasons that follow.
The evidence introduced at trial established that on April 20, 2009, defendant called 9-1-1 to report that her boyfriend/husband had been shot and required assistance. Defendant identified herself by name and when asked if the shooter was still present, she replied, “It’s me.” The first officer to respond did so within three minutes, and encountered defendant *995 frantically waving her arms outside of her house, saying her boyfriend had been shot, and that his body and the gun were still inside the residence. The officer testified that upon entering and |2securing the house, he discovered the victim lying on a bloodied bathroom floor propped up against the bathtub and a gun on a nearby bed. After securing the premises, the officer then let EMTs from the Acadian Ambulance Service into the bathroom in an attempt to revive the victim. The lead detective, Dwayne Angelle, observed stippling from the gun on the skin of the victim, who was clad in a pair of pants but shirtless. The gun found on the bed was a .357 Magnum. No fingerprints were recovered from it and the state presented no ballistics evidence to match a bullet removed from the bathroom wall to the revolver. The gun was found to be in working order, “like every other revolver” the detective had shot, with a normal trigger pull. Detective Angelle acknowledged that if the gun were first cocked, much less pressure was required to pull the trigger. However, in either case, the shooter would have to reach through the trigger guard and pull the trigger to fire the weapon. The officer explained that stippling, produced by the spray of gun powder ejected from the barrel of a gun impacting skin and causing small burns, meant that the .357 Magnum had been fired at close range. The detective noticed no water on the floor and no evidence of any footprints in the area, although there was blood “all around the body” and the EMTs had placed some leads on the victim in an attempt to revive him.
The coroner testified that the bullet fired from the gun entered the victim’s right lower back shoulder and exited from his upper chest area approximately five inches above the entrance wound. He stated the bullet passed upwards through the lower right lung, through two chambers of the heart, severed the aorta and pulmonary arteries, and traveled through the upper left lung, before exiting the victim’s body and embedding in the bathroom wall. He agreed with Detective Angelle that the stippling indicated the victim had suffered a close-range wound, and estimated the distance as anywhere from a few inches to up to four feet away. ^Though ultimately not relevant to defendant’s case, the coroner determined the victim had amphetamine, methamphetamine, and MDMA (“ecstasy”) in his urine at the time of his death. In response to a question by defense counsel, the coroner stated his understanding “that there was some sort of altercation” before the shooting took place.
No state witness could testify as to what made the gun fire, or whether the shooting itself was accidental. A blood spatter analyst testified that in his opinion, the victim was probably standing bent over the bathroom sink when he was shot. Because the bullet had severed his aorta artery, causing his blood driven by arterial pressure to splash out against the wall in a characteristic pattern, the victim would have gone down “real fast.” Based on the relatively small size of powder stippling at the entrance wound, the expert placed the outside distance of the gun when it fired at three feet.
Defendant did not testify at trial but to a significant degree, the evidence presented at trial was shaped by a statement she gave to the police on the night of the shooting that jurors never heard. In that statement, defendant characterized her relationship with the victim as abusive because he had “a lil’ mean streak in him,” and that they had quarreled in the past, often over his drug use, and intermittently throughout the day before the shooting. Defendant explained that the .357 Magnum belonged to her, a gift from her ex-husband, and that she knew how to shoot *996 it, but that the victim had often picked it up when they quarreled. Defendant stated that on the night of the shooting, she had gone into the bathroom to brush her teeth when the victim approached her gun in hand. She convinced him to hand her the weapon and that when he did so, she slipped as he came forward, as if to push her, and the gun went off. Defendant recalled that the victim had been facing ]4her but that just before the gun fired, he had turned and then turned back with a look of fear on his face after the gun discharged into his body.
Neither side introduced defendant’s statement at trial, although the state had filed a notice pursuant to La.C.Cr.P. art. 768 of its intent to introduce the statement as well as the 9-1-1 call. However, reflecting the substance of the interview, in opening statements, the state remarked that “obviously there was some kind of disturbance going on between the two of them,” and defense counsel, conceding that he had not yet made the decision whether to call defendant to the stand, informed jurors that one way or another, through police testimony or through defendant, jurors would hear “her story,” ie., the narrative given by defendant to the police which he then outlined for jurors.[1] Thereafter, on cross-examination, defense counsel sought to establish that there may have been water on the floor of the bathroom, perhaps concealed under the body of the victim slumped against the bathtub. However, Detective Angelle testified that he noticed no water on the floor along with the blood around the victim’s body, although he could not discount the possibility that it may have evaporated by the time the officers arrived. Defense counsel also wrangled with the state’s blood spatter expert over his opinion that the victim had been shot in the back as he bent over the wash basin in the bathroom. Counsel suggested that the bullet would have taken a downward trajectory in that | ¿scenario but the evidence established that the bullet had traveled upwards, a trajectory counsel clearly thought consistent with defendant’s account to the police that the victim, whom she described as an inch taller than she, had turned away from her momentarily when the gun discharged then turned back with his face full of fear. In the face of vigorous cross-examination, the expert maintained his opinion that the trajectory of the bullet was entirely consistent with the victim bending over the wash basin when he was shot.
In the end, jurors heard no evidence that defendant had been in a tumultuous relationship with the victim or that they had quarreled that day, or that she had slipped on the bathroom floor as the victim confronted her. Instead, both sides argued the case from the perspective of what happened after the shooting occurred. The state emphasized that the police found no evidence of footprints in the blood
*997 splashed on the floor of the bathroom or that defendant had taken any measures in an attempt to staunch the flow of blood before she called 9-1-1. Defense counsel urged jurors to consider that from the outset, in her 9-1-1 call defendant acknowledged she had shot the victim, that she was frantic, in a state of hysteria, waving to the police as they arrived and urging them into the house. With no evidence that defendant had been provoked, counsel described the shooting as a “horrible accident,” and urged jurors to consider only two possible verdicts: guilty of negligent homicide or not guilty.
The failure of either side to establish a larger context for the shooting played a critical role in the court of appeal’s decision to reverse defendant’s conviction and sentence. The majority on the panel readily acknowledged that there were two circumstances from which jurors could have inferred a specific intent to kill: the victim was shot at close range and defendant had been involved in some sort of altercation with the victim on the day of the shooting. As to the former, while the | ^deliberate shooting of someone at close range may support a finding of specific intent to kill as a circumstantial inference from the evidence presented, see, e.g.. State v. Williams, 383 So.2d 369, 373 (La.1980); State v. Procell, 365 So.2d 484, 492 (La.1978), the state had “presented no evidence demonstrating that Defendant aimed the gun at the victim, [or] how the gun discharged.” Trahan, 11-148 at 6-7, 69 So.3d at 1244. The majority emphasized the testimony that relatively little force would have been needed to pull the trigger if the gun had first been cocked. As to the latter circumstance, the prosecutor had no evidence of any altercation but “merely words,” without “one piece of evidence ... to prove an argument or that Defendant was angry at the victim.” Id., 11-148 at 6, 69 So.3d at 1244. The state had thus failed to present any evidence that defendant had a motive for the shooting, a circumstance which tended to negate a finding of specific intent. Id., 11-148 at 6, 69 So.3d at 1244 (“Motive is not an essential element of murder, but ‘a lack of motive may properly be considered as a circumstance mitigating against specific intent.’ ”) (quoting State v. Mart, 352 So.2d 678, 681 (La.1977)). Given the sparseness of the state’s case, the court of appeal majority found themselves “firmly convinced that the only explanation for the jury’s verdict of second degree murder was the information supplied to them in the opening and closing statements.” Id., 11-148 at 8, 69 So.3d at 1245-46. However, these statements “are not subject to a sufficiency review under the Jackson [v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ] standard because the statements do not constitute evidence.” Id.
The court of appeal thus reversed defendant’s conviction for second degree murder. The majority further discounted the possibility of entering a judgment for the lesser included offense of manslaughter, as to which the State failed to prove specific intent, or negligent homicide, as to which “the State did not meet its |7burden of proving that Defendant acted below the standard of care expected to be maintained by a reasonably careful person under like circumstances.” Trahan, 11-148 at 12, 69 So.3d at 1247. In the end, as to all verdicts, the state’s witnesses conceded that they did not know how the gun discharged or whether the shooting was accidental. Thus, the reasonable hypothesis advanced by the defense on cross-examination of the state’s witnesses, ie., that the shooting was accidental and not deliberate, was “sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt.” Id. Dissent *998 ing, Judge Gremillion observed that the state’s “lackluster presentation of evidence” would not have precluded a rational juror, considering that the only issue presented was whether the shooting was deliberate, from concluding that “[pjointing a loaded gun at the victim — even if the gun was accidentally discharged — exhibits a gross deviation below the standard of care expected from a reasonably careful person.” Trahan, 11-148 at 2, 69 So.3d at 1249. Judge Gremillion thus found the evidence sufficient to have convicted defendant of negligent homicide in violation of La.R.S. 14:32. Id.
We do not agree with the premise of the court of appeal’s decision that the due process question under Jackson v. Virginia, whether the evidence was sufficient for a rational trier of fact to find defendant guilty of second degree murder, must be resolved entirely outside of the context of what counsel for the state and defense did or did not say in their opening and closing remarks. It clearly appears that most of the extra-record information provided by counsel came not from the state but from the defense when counsel outlined in his opening remarks the hypothesis of innocence, based on a statement jurors would never hear, that defendant slipped in her bathroom after disarming the victim and fired accidentally in the culminating event of an abusive relationship and a day-long argument. The |strial court appropriately instructed jurors at the close of the case that “opening statement and the closing arguments are not to be considered as evidence.” However, the trial court also appropriately informed jurors that in opening statements, “the attorney[s] were permitted to familiarize you with the facts they expected to prove.” See 1 Louisiana Judges’ Criminal Bench Book, § 3.07, p. 22 (Louisiana Judicial College 1995) (Model Instruction: “In opening statements the attorneys were permitted to tell you the facts they expected to prove. In closing arguments the attorneys were permitted to present for your consideration their contentions regarding what the evidence has shown or not shown and what conclusions they think may be drawn from the evidence. The opening statements and closing arguments are not to be considered as evidence.”) (citing State v. Green, 343 So.2d 149 (La.1977)).
Jurors were therefore entitled at the close of the evidence to hold the defense accountable for its failure to introduce any evidence in support of the hypothesis of innocence proposed by defense counsel, apart from the coroner’s vague statement in response to questioning by the defense that he understood some sort of altercation had occurred earlier on the day of the shooting, a detail far more helpful to the state than the defense because it provided the only evidence of motive in the case. Jurors were also entitled to consider the direct evidence defendant provided in her admission to the 9-1-1 operator that she had shot the victim and to the first responders that the victim’s body and the gun were still inside the house, the source for defense counsel’s own judicial admission in his opening and closing remarks that defendant had killed the victim with the gun found by the police in the residence. See Martinez v. Bally’s Louisiana, Inc., 244 F.3d 474, 477 (5th Cir.2001) (“Although a judicial admission is not itself evidence, it has the effect of withdrawing a fact from contention.”); United States v. Blood, 806 F.2d 1218, R1221 (4th Cir.1986) (“Generally, statements by an attorney concerning a matter within his employment may be admissible against the retaining client. Further, a clear and unambiguous admission of fact made by a party’s attorney in an opening statement in a civil or criminal case is binding upon the party.”); United States v. McKeon, 738 F.2d *999 26, 30 (2nd Cir.1984) (“An admission by a defense attorney in his opening statement in a criminal trial has ... been held to eliminate the need for further proof on a given element of an offense.”) (citation omitted); Hall v. Wal-Mart Stores East, LP, 447 F.Supp.2d 604, 608 (W.D.Va.2006) (“Though case law on the issue is scarce, the principle that an admission of counsel during trial ‘may dispense with proof of facts for which witnesses would otherwise be called’ has been recognized by the Supreme Court since 1880.”) (citing Oscanyan v. Arms Co., 108 U.S. 261, 263, 26 L.Ed. 539, 541 (1880) (“The power of the court to act in the disposition of a trial upon facts conceded by counsel is as plain as its power to act upon the evidence produced.”)).
It clearly appears that jurors reasonably rejected the hypothesis of innocence proposed by the defense which produced no evidence in support of it. The due process question under Jackson therefore is not whether “another possible hypothesis ... could explain the events in an exculpatory fashion,” but whether, viewing the evidence in a light most favorable to the state, an alternative hypothesis exists that is “sufficiently reasonable that a rational juror could not ‘have found proof of guilt beyond a reasonable doubt.’ ” State v. Captville, 448 So.2d 676, 680 (La.1984) (quoting Jackson). Because the hypothesis rejected by jurors came from defense counsel, as opposed to defendant’s statement to the police on the night of the offense, or defendant’s testimony from the stand, jurors could not infer from the failure of the hypothesis that defendant lied to conceal her guilt. Captville, 448 So.2d at 680, n. 4 (“ ‘Lying’ has been recognized as indicative |inof an awareness of wrongdoing.”) (citing State v. Rault, 445 So.2d 1203, 1213 (La.1984) (“The jury could have reasonably concluded that Rault concocted this version of the crime to hide his own guilt.”)). Thus, viewed in the light most favorable to the prosecution, the evidence at trial, as shaped by the admissions of fact made by defendant on the scene and by the judicial admissions of defense counsel in his opening and closing statements, established that the victim died from a single shot fired at close range, less than four feet, by a high-powered hand gun as he stood bent over the wash basin in the bathroom, a stance the state’s blood spatter expert found entirely consistent with the apparent upward trajectory of the bullet as it traveled through the victim’s body and exited his left shoulder into the bathroom wall. From the outset, defendant identified herself as the shooter and informed the police that the gun she used was still inside the residence. Evidence established that the weapon had a normal trigger pull and that even when cocked, the trigger had to be pulled within the trigger guard to fire a round. There was no evidence of water on the floor or of any footprints in the blood spilled on the floor indicating that defendant may not have entered the bathroom after she shot the victim through the heart in a spray of blood and he went to the floor “real fast,” although the Acadian Ambulance Service EMTs on the scene evidently left no footprints when they attended to the victim. There was no evidence defendant attempted to aid the stricken victim after he slumped against the bathtub but there was evidence that defendant was frantic, nearly hysterical, when she called 9-1-1, and then greeted the police outside imploring them to rush to the victim’s aid. There was some evidence from the coroner that an altercation had occurred earlier that day.
A rational trier of fact could find from this evidence that defendant discharged the high-powered hand gun by pulling the trigger while holding the gun |nno more than three or four feet from the victim as *1000 he stood defenseless and bent over the washbasin in the bathroom with his back turned towards her, and from that evidence, that defendant had the specific intent to kill or to inflict great bodily harm, although she may then have become emotionally overwrought by what had just happened. Other scenarios involving an accidental discharge of the revolver, but not involving the failed hypothesis of innocence proposed by defense counsel and rejected by jurors, were possible but not so probable that a rational juror would necessarily have a reasonable doubt as to defendant’s guilt.
We therefore reverse the decision below, reinstate defendant’s conviction for second degree murder and life sentence, and remand the case to the district court for execution of sentence.

. Counsel thus informed jurors:
And what her story is that George [the victim] had a temper. She has a temper. They argued a lot. And when George would get mad, he would go get the gun and he would wave the gun and point the gun while they were arguing. And it scared her because she’s going to testify — you’re going to hear testimony that George had a drug problem and abused drugs, and she was afraid .... they were in a, sadly, an abusive relationship. And on this particular occasion, he came into the bathroom where she was already. He didn’t retreat into the bathroom. He came after her into the bathroom, waving the gun around. And she said, George, give me the gun. So then he gave the gun. There was some water on the floor; she slipped. The gun discharged. It struck George, and ultimately, he dies. Okay. And it's tragic. It’s horrible. It's a horrible thing that happened. But let’s talk about what she did thereafter.