**EXPEDITERS INTERNATIONAL of WASHINGTON, INC., a Washington Corporation, Plaintiff,**

v.

**DIRECT LINE CARGO MANAGEMENT SERVICES, INC., Defendant.**

**Civ. No. 93–5450 (JAP).**

United States District Court,
D. New Jersey.

Feb. 13, 1998.

---

Brian Frederick Amery, Bressler, Amery & Ross, Florham Park, NJ, for Expeditors International of Washington, Inc.

Roy Henry Wepner, Lerner, David, Littenberg, Krumholz & Mentlik, Westfield, NJ, for Direct Line Cargo Management Services, Inc.

David H. Pikus, Bressler, Amery & Ross, Morristown, NJ, for Expeditors International of Washington, Inc., Wei Jhih Chang.

Arnold B. Dompieri, Lerner, David, Littenberg, Krumholz & Mentlik, Westfield, NJ, for Marihill, Ltd.

## OPINION

PISANO, United States Magistrate Judge.

## INTRODUCTION

This matter comes before the Court upon the motions of defendant Direct Line Cargo Management Services, Inc. for summary judgment on plaintiff Expediters International of Washington, Inc.'s copyright infringement, trade secret misappropriation, and breach of contract claims, pursuant to Rule 56 of the Federal Rules of Civil Procedure.[1] The parties have submitted briefs, and oral argument was heard on January 5, 1998. For the following reasons, the defendant's motions for summary judgment are denied.

## FACTUAL SUMMARY

This matter involves the alleged wrongful use of a computer software program. Plaintiff Expediters International ("EI") claims that a Taiwan company, Direct Line Cargo Management Services, Inc. ("CMS–Taiwan"), became affiliated with it and assigned to it the rights of an allegedly copyrighted software program. Prior to EI's affiliation with CMS–Taiwan, CMS–Taiwan was associated with the New Jersey defendant, Direct Line Cargo Management Services, Inc., ("DLCMS–USA"), and a group of affiliated Asian companies. During its association with the defendant, CMS–Taiwan issued a license to the defendant and its affiliates which permitted the companies to make limited use of the software. When CMS–Taiwan became associated with the plaintiff, however, this license expired. This lawsuit

---

**1.** On July 11, 1994, the parties consented to the jurisdiction of the undersigned, pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure.

arises from the defendant's, and its affiliates,' alleged wrongful use of the software subsequent to the expiration of the license.

## BACKGROUND

Plaintiff EI is a large international freight forwarding company that engages in the business of ocean consolidation services. *See* Countercl. ¶ 1. The plaintiff became affiliated with CMS–Taiwan on September 15, 1993. *See* Complaint ¶ 6. As part of this affiliation, EI claims it acquired all rights to computer programs known as freight consolidation software (the "Software"), which CMS–Taiwan had previously developed and registered with the United States Copyright Office. *See* Pikus Decl. at Ex. O; Complaint ¶ 8. The Software enables consolidation companies to provide timely tracking and billing information about ocean freight shipments. *See* Yunker Aff. ¶ 8.

Defendent DLCMS–USA is a New Jersey firm that was "part of a group of companies interrelated through various contractual obligations and stock ownership which offered . . . ocean cargo consolidation services." Countercl. ¶ 4. The companies were affiliated "to provide the sales and marketing services in the United States, and . . . to provide the warehouse and documentation services in various Asian countries." 12/23/93 McKenzie Decl. ¶ 1. According to Mr. George McKenzie ("McKenzie"), the President of DLCMS–USA, "the idea behind the formation of the companies in 1983 was to use the emerging technology of personal computers and telecommunications in Ocean Cargo consolidation services . . ." 12/23/93 McKenzie Decl. ¶ 7.[2]

The defendant's pleadings characterize this group of companies, including a number of affiliated agents based in Singapore, Taiwan, Thailand, and other Far Eastern countries, as a "single business entity." Countercl. ¶ 5. A separate Hong Kong Holding Company, Marihill Ltd. ("Marihill"), is a principal of these Asian companies. *See* 12/23/93 McKenzie Decl. ¶ 2, 4, and 5. Yorkmate Ltd. ("Yorkmate") is the majority shareholder of Marihill and defendant. *See id.* McKenzie owns 38% of the stock of DLCMS–USA, and 30% of the Yorkmate shares. *See id.* Ex. D. In his Declaration, McKenzie describes the relationships, profit distribution, commission, and billing practices that existed between DLCMS–USA and the Asian companies.[3] *See* 12/23/93 McKenzie Decl. ¶ 2. Mutual agency agreements existed among these companies, whereby the Asian affiliates agreed to provide staff, facilities and customer information to the defendants for freight consolidation. *See id.* Ex. A.

While it was still associated with these companies, Countercl. ¶ 5, CMS–Taiwan used the defendant as its agent in the United States. Complaint ¶ 12. At that time, CMS–Taiwan permitted the defendant to use its Software for the limited purposes described in a license agreement dated June 29, 1993 (the "License Agreement"). This agreement permitted the Asian companies to receive origin data entry Software programs, while DLCMS–USA received the destination Software programs via electronic mail. Yunker Aff. ¶ 7; 8/20/97 McKenzie Decl. ¶ 3. In this manner, a customer's goods in Asia were consolidated with other freight and loaded on a vessel destined for the United

---

**2.** The affiliated Asian companies were as follows:
 (1) Direct Line Cargo Management Services, Ltd. in Hong Kong.
 (2) Advanced Cargo Management Services Ltd. in Hong Kong.
 (3) Direct Line Cargo Management Services, PTE., in Singapore.
 (4) Cargo Management Services Thailand Co., Ltd. in Thailand.
 (5) Se–Yang Cargo Management Services Co., Ltd. in Korea.
12/23/93 McKenzie Decl. ¶ 1.

**3.** "There are mutual agency agreements running between Marihill Ltd. and the Asian operating companies. The Asian companies direct 50% of their profits to Marihill Ltd. All billing services to

U.S. importers is made through DLCMS–USA. DLCMS–USA has a commission agreement with Marihill Ltd. . . . The philosophy of this family of companies is that the services of all the affiliated Asian origin agents must be used by a customer in order to obtain the services of DLCMS–USA.

 Prior to the start-up of this family of companies all of the individuals involved, as heads of either the U.S. based company or the Asian based companies, were formerly employed by . . . Buyers Consolidators, Ltd. This group left Buyers Consolidators at approximately the same time in 1983 to form this family of companies . . . [and] to use the emerging technology . . . in Ocean Cargo consolidation services . . ."
12/23/93 McKenzie Decl. ¶¶ 2–7.

States. Yunker Aff. ¶ 8. The relevant information was then accessed through the Software, transferred onto documents,[4] and transmitted to the defendant and the customer-recipient in New Jersey. *Id.* As such, DLCMS–USA could use the Software to report the receipt of the goods at destination with other relevant data and to bill the customer for the total service, remitting a share of the proceeds to Asia. *Id.*

The License Agreement between CMS–Taiwan and DLCMS–USA provides that:

> The owner of the copyright of all [CMS–Taiwan] programs has authorized its use at DLCMS–USA office [sic] for the purpose of providing assistance to nominated [CMS–Taiwan] customers in the U.S. for the system application and first aid system problem identifications. Any other use of these programs, including any copying and/or reproduction of any of the material in it, any of the program logic in it, any part of the user menu with it, is an infringement of copyright and may result in civil liability or criminal prosecution as provided by law.

> The owner of the copyright of all CMS–Taiwan programs has authorized and only authorizes its use at DLCMS–USA office [sic] for the programs CMS–Taiwan provides to DLCMS–USA management and staffs should have no access and must have no access to any of the programs CMS–Taiwan made and provided to any other CMS offices or agents offices in Asia unless otherwise specified and authorized in writing by CMS–Taiwan in advance.

> The owner of the copy right [sic] of all CMS–Taiwan programs is Direct Line Cargo Management Services, Inc., a Taiwan company....

Yunker Aff.Ex. B.

In addition to the June 29, 1993 Agreement between the defendant and CMS–Taiwan, the Asian companies entered into confidentiality agreements with CMS–Taiwan, which limited their use of the Software.[5] These agreements provide:

> All programs and user manual are for [the Asian affiliate's] individual office to use which should be kept in good condition as confidential documents and to be within your own individual office only. No user manual and/or programs to be copied and/or to be shared with any person/party/company out side [sic] of your own office ... All report printout from the program are also part of the confidential documents and should only be sent to CMSNJ, CHB, and consignee offices ...

> The objective of this request is to keep the integrity of the information under CMSTWN programs and to prevent any competition to know what we have been [sic] done and what is going to be. As you all [sic] aware of the situation of today that automation is the key part of the function behind a consolidation program and all CMS competitions [sic] are trying hard in all method [sic] to find out what we have today.

12/14/91 Confidentiality Agreements, Pikus Decl.Ex. M. CMS–Taiwan and the Asian companies exchanged related messages by telefax:

> [A]ll programs from CMSTWN ... are required to be kept as confidential documents and papers which include the user menu and all the correspondences from CMSTWN. There is no reason that any of those programs and documents would be released to any person outside of your office. Please notice the copyright of all those programs are owned by CMSTWN which as [sic] specified very clearly on the front screen of every program.

7/6/93 telefax, 10/31/97 Libowsky Decl.Ex. A; 12/14/91, 7/6/93, and 7/7/93 telefaxes, Pikus Decl.Ex. M.

When CMS–Taiwan became affiliated with the plaintiff, it continued its relationship with the group of companies until the termination agreement took effect on September 15, 1993. *See* Complaint ¶¶ 12, 14. At this time, the plaintiff offered the defendant the oppor-

---

**4.** In their briefs, the parties refer to these shipping documents as "container manifests," "manifests," "shipping manifests," and "shipping documents." The Court refers to these documents collectively as "manifests."

**5.** Although CMS–Taiwan permitted the companies to use its Software, it did not reveal the Software's source code to these companies. *See* Complaint ¶ 10; Lincoln Aff. ¶ 6.

tunity to join in its venture with CMS–Taiwan. However, the defendant "declin[ed] to join any affiliation between plaintiff and CMS–Taiwan." Defendant's Answer to Complaint ¶ 14. The parties subsequently agreed to a sixty day transition agreement, (the "Transition Agreement"), extending from September 15, 1993 until November 15, 1993, during which time the plaintiff and CMS–Taiwan permitted the defendant to use the Software for specific customers.[6] *See* 12/28/93 McKenzie Deposition, Libowsky Decl.Ex. D; Yunker Aff. ¶ 9.

On December 13, 1993, plaintiff filed this action alleging that the defendant, in conjunction with its Asian affiliates, continued to use the Software for freight consolidation billing and reporting purposes, despite the expiration of the License Agreement and the transition period. When it filed its Complaint, plaintiff simultaneously filed a motion for a preliminary injunction and for a temporary restraining order. On December 22, 1993, Judge Sarokin entered an Order temporarily restraining defendant from using the Software for any purpose other than to serve five specific clients. *See* 12/22/93 Order.

EI seeks relief for copyright infringement, trade secret misappropriation, and breach of contract. Specifically, the plaintiff claims that DLCMS–USA directed and authorized the Asian affiliates to use their copies of the Software to print shipping manifests and bills of lading. *See* Brief in Opposition of the Defendant's Motion for Summary Judgment of No Copyright Infringement at p. 22. EI claims that the defendant then violated EI's rights through its receipt of those manifests, its subsequent use of the shipping documents to compute billing amounts and invoices, and its forwarding copies of the manifests to the customers. *See id.* at p. 16. Specifically, the plaintiff seeks damages resulting from the defendant's alleged use of the Software with respect to thirty customers, between November 16, 1993 and December 31, 1994. *See* Transcript of 1/5/98 Proceedings at p. 39.

In support of its claims, plaintiff offers the expert report of Mr. Jeffrey M. Morrison.[7] After comparing manifests generated by the Software in October 1993 (during the transition period) with manifests that the Asian companies generated and transmitted to the defendant in January 1994 (after the transition period), Morrison concluded that the Asian companies continued to use the Software to generate manifests after the transition period expired. *See* Exp.Rept., Wepner Decl.Ex. A. Morrison reached this conclusion owing to the similarities between the two reports.[8] *See id.* According to Morrison, the format of manifests are completely controlled by the original program instructions, (the "source code").[9] For this reason, Morrison claims "it defies reason that two versions of a report created by two different software developers or development teams working independently of each other, would both produce the identical results ... The chances of

---

**6.** "We had agreed on a transition date that the software would—up to which the software would be available to the balance of the company and from which the software would know [sic] longer be available." 12/28/93 McKenzie Deposition, Libowsky Decl.Ex. D.

**7.** According to his resume, Morrison has over twenty-five years of Financial and Executive Information System design and data processing experience. He has an expertise in client/server application design with mainframe and PC-based data management systems. He was formerly a Vice President at Citibank/Citicorp, and has designed systems for Western Electric and Manufacturers Hanover Trust. *See* Wepner Decl.Ex. A.

**8.** "For example the two 'Container Manifest' reports have their information presented in the same order, with the same column heading, using the same abbreviations. In addition, in the

'Container Manifest' reports there are columns ... Both 'Container Manifest' reports show the same alignment for all nineteen columns with data." Exp.Rept., Wepner Decl.Ex. A.

**9.** A source code is the form in which software is displayed. According to Jager, "The 'source code' is a human-readable program language, including English words and common mathematical notations, which is created by the programmer. The 'object code' ... is the machine-readable language, usually in binary number form, which is needed to create the electrical impulses which operate the computer central processing unit (CPU). The 'source code' is converted into the machine-readable 'object code' during the programming of the computer by a suitable device such as a 'compiler' ... Most programs are written in the higher-order source code language, which skilled programmers can understand." Jager, *Trade Secrets Law*, § 9.03 at 9–24–25 (Supp.1997).

this occurring are about 1 in $3^{E-19}$." Exp. Rept., Wepner Decl.Ex. A at 3.

The plaintiff also relies on an affidavit from its Development Manager, John Yunker. *See* Yunker Aff. ¶¶ 14–47 and Exs. J–U. Yunker compared the source code for the portion of the Software that controls the printing of manifests with the defendant's manifests generated on November 26, 1993 (after the transition period), to determine whether the companies used the Software to generate this document. *See id.* By comparing this data, Yunker determined that "the Software, or an identically 'reverse engineered' copy of the Software, was used to create the printed page identified as [the defendant's manifest]".[10] *Id.* ¶ 30.

Furthermore, the plaintiff relies on certain admissions from the defendant. McKenzie confirmed that the manifests which Morrison compared with the source code were "received by DLCMS ... [and] generated in Hong Kong ... [and] Singapore." McKenzie Decl. ¶ 3. Correspondence dated November 23, 1993, from the defendant's former counsel, Mr. Hamilton, Esq., states: "DLCMS–USA is now using the software only as requested by these [five] customers [who held extensions from plaintiff] ... DLCMS will pay royalty fees retroactive from November 16, 1993." 11/23/93 Hamilton Correspondence, Yunker Aff.Ex. C. Hamilton reiterated this contention during oral arguments on both December 13, 1993 and February 14, 1994 before Judge Sarokin, stating that five of DLCMS–USA's customers "insisted ... they be allowed to continue to use [the Software] during the transition period while they decide which way to go." Transcript of 12/13/93 Proceedings at pp. 13–14, Yunker Aff.Ex. F; Transcript of 2/14/94 Proceedings at p. 8, Yunker Aff.Ex. G. Finally, on December 29, 1993, the defendant's systems supervisor, Charles Conover III, testified that the process of generating billing documents on

software in Asia and transmitting them to the defendant in New Jersey for use did not change after the expiration of the license on September 15th, 1993.[11] *See* Conover Deposition at 21, Yunker Aff.Ex. U.

On October 10, 1997, DLCMS–USA filed this motion for summary judgment on the plaintiff's claims for copyright infringement, trade secret misappropriation, and breach of contract. EI simultaneously filed a motion for contempt, alleging that the defendant and the Asian companies continued to use the Software after Judge Sarokin issued the temporary restraining order on December 13, 1993. The latter motion was denied without prejudice. *See* 2/11/98 Order.

## ARGUMENT

### I. *Summary Judgment Standard.*

The standard for granting summary judgment under Federal Rule of Civil Procedure 56 is a stringent one: summary judgment shall be granted only when there are no genuine issues of material fact in dispute and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). *See Hersh v. Allen Prods. Co.*, 789 F.2d 230, 232 (3d Cir. 1986). In deciding a motion for summary judgment, a federal district court must construe the facts and inferences in a light most favorable to the nonmoving party. *See Pollock v. American Telephone & Telegraph Long Lines*, 794 F.2d 860, 864 (3d Cir.1986). The role of the Court is "not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

The standards announced by the Supreme Court place the burden of demonstrating that there is an absence of genuine issues of material fact on the party moving for sum-

---

**10.** "I have reached this conclusion because the string of characters in the source code to the *Software for these data sets is identical* ... in my opinion and experience, it would be practically impossible for the identical text ... to have been created by a independent programming effort." Yunker Aff. ¶ 30.

**11.** Q. Can you explain to me how the billing is done?

A. We, except for Service Merchandise, Asia, all our Asia offices send, fax us manifests and copies of the bill of lading, which we then enter certain parts in to our invoice program in New Jersey.

Q. Has that practice changed at all since September 15th of this year?

A. Not that I know of.

Conover Deposition at 21, Yunker Aff.Ex. U.

mary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–32, 106 S.Ct. 2548, 2552–58, 91 L.Ed.2d 265 (1986). If the moving party sustains this burden, it is incumbent upon the nonmoving party to come forward with specific facts to show that there is a genuine issue of material fact for trial. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505, 91 L.Ed.2d 202. It is the role of the court to then ask whether the summary judgment record is sufficient such that a reasonable jury could find facts that demonstrate, by a preponderance of the evidence, that the nonmoving party is entitled to a verdict. *See In re Paoli R.R. Yard PCB Litigation*, 916 F.2d 829, 860 (3d Cir.1990), *cert. denied*, 499 U.S. 961, 111 S.Ct. 1584, 113 L.Ed.2d 649 (1991).

## II. Copyright Infringement.

■ EI claims that DLCMS–USA infringed on its copyright by authorizing its Asian affiliates to use the Software for billing purposes after the expiration of the License Agreement.[12] The plaintiff bears the burden of proof in a copyright action. *See Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 434, 104 S.Ct. 774, 784–85, 78 L.Ed.2d 574 (1984); *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 290 (3rd Cir.), *cert. denied*, 502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991); *Midway Mfg. Co. v. Bandai–America, Inc.*, 546 F.Supp. 125, 138 (D.N.J.1982). To establish a *prima facie* case of copyright infringement, a plaintiff must prove: (a) ownership of a valid copyright in the infringed work; and (b) copying by defendant (or a violation of another of the exclusive rights provided to a copyright owner by the Copyright Act). *See Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1162 (9th Cir.1977); *CMM Cable Rep, Inc. v. Keymarket Communications, Inc.*, 870 F.Supp. 631, 636 (M.D.Pa.1994).

For the purposes of this motion only, DLCMS–USA does not contest that the plaintiff has actual ownership of the copyrighted Software, or that the expert report raises a genuine issue of material fact as to whether the Asian companies used the Soft-

ware after the expiration of the License Agreement. *See* Transcript of 1/5/98 Proceedings at pp. 8, 15. However, the defendant raises three arguments in support of its summary judgment motion.

Firstly, DLCMS–USA contends that EI's copyright infringement claim is beyond the jurisdiction of this Court, since the alleged acts of infringement occurred outside of the United States. Secondly, defendant argues that the plaintiff is not entitled to relief in connection with the defendant's use of manifests generated by the Asian companies after the transition period. Thirdly, DLCMS–USA contends that the alleged use of plaintiff's Software was permissible under Section 117 of the Copyright Act. The Court examines each argument in turn.

### a. Extraterritoriality.

■ The defendant urges the Court to grant its motion because the Asian companies allegedly copied the Software overseas, beyond the jurisdiction of the United States Copyright Act. *See* Brief in Support of Summary Judgment for Copyright Infringement at p. 9. DLCMS–USA argues that the mere authorization of these infringing acts abroad is not sufficient to establish primary liability so as to bring the plaintiff's action within the jurisdiction of this Court. It also argues that, even if the Court were to attach primary liability to the mere act of authorizing infringement, there is no evidence that the defendant, in fact, authorized the Asian affiliates to copy the Software.

Section 501 of the Copyright Act states that "[a]nyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 118 ... is an infringer of the copyright ..." 17 U.S.C. § 501(a). According to Section 106 of this act:

[T]he owner of a copyright ... has the exclusive rights to do and to authorize any of the following:

(1) to reproduce the copyrighted work in copies or phonorecords;

---

**12.** Initially, EI alleged that DLCMS–USA continues to directly use the Software, or a derivative thereof. During oral argument, however, plaintiff's counsel conceded that it could not prove

that the defendant derived its present freight consolidation software, "the Lognet," from the Software at issue. *See* Transcript of 1/5/98 Proceedings at p. 12.

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies ... of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease or lending ...

17 U.S.C. § 106 (1996).

There is a division among courts as to whether a claim for infringement can be brought under the Copyright Act when the alleged infringing conduct consists solely of the authorization within the United States of acts that occur entirely abroad. For example, the Ninth Circuit has held that such authorization, by itself, cannot not support a United States infringement claim. *See Subafilms, Ltd. v. MGM–Pathe Communications Co.*, 24 F.3d 1088 (9th Cir.1994). In contrast, a district court in the Sixth Circuit has held that, by authorizing the release of copyrighted music recordings overseas, a United States entity commits primary infringement that is actionable under Section 106. *See Curb v. MCA Records, Inc.*, 898 F.Supp. 586 (M.D.Tenn.1995).

In *Subafilms*, the plaintiffs alleged that Warner Brothers violated its copyright in the Beatle's movie, "Yellow Submarine," by authorizing distributors to release video versions of the movie abroad. 24 F.3d 1088. The Court tied the authorization right in Section 106 solely to a claim of contributory infringement; it reasoned that a defendant in the United States could not be liable based on its authorization of infringing acts, where the overseas entity who actually copied the materials was not subject to United States Copyright Law. *See id.* at 1094. The Court noted that "to hold otherwise would produce the untenable anomaly, inconsistent with the general principles of third party liability, that a party could be held liable as an infringer for violating the 'authorization' right when the party that it authorized could not be considered an infringer under the Copyright Act." *Id.*

While the defendant urges the Court to apply *Subafilms'* interpretation of Section 106, the Court departs from the Ninth Circuit's interpretation and adopts the holding set forth in *Curb v. MCA Records, Inc.*, 898 F.Supp. 586. In *Curb*, the defendant counterclaimed that a music company violated its licensing agreement by authorizing infringing acts abroad. *See id.* The Court denied the plaintiff's summary judgment motion, finding that there was a genuine issue of material fact as to whether the plaintiff engaged in primary infringement by merely authorizing the release of copyrighted sound recordings overseas. *See id.* The court held that authorizing infringing acts may constitute primary infringement in light of both the language and legislative history[13] of the Statute. *See id.* at 595–96. Furthermore, it reasoned that imposing direct liability for authorizing infringement more closely serves the underlying policies of the Copyright Act in this modern era. *See id.* at 595. Specifically, the Court noted:

> [P]iracy has changed since the Barbary days. Today, the raider need not grab the bounty with his own hands; he need only transmit his go-ahead by wire or telefax to start the presses in a distant land. *Subafilms* ignores this economic reality, and the economic incentives underpinning the Copyright clause designed to encourage creation of new works, and transforms infringement of the authorization right into a requirement of domestic presence by a primary infringer. Under this view, a phone call to Nebraska results in liability; the same phone call to France results in riches. In a global marketplace, it is literally a distinction without a difference.

*Id.*

This Court agrees with *Curb's* literal interpretation of Section 106, which clearly lends "the owner of a copyright ... the exclusive rights *to do and to authorize* " the reproduction and distribution of copyrighted materials. 17 U.S.C. § 106 (emphasis supplied). Furthermore, the Court appreciates the policy observations set forth in *Curb*, which ap-

---

**13.** The legislative history of Section 106 reveals: "Use of the phrase 'to authorize' is intended to avoid any questions as to the liability of contributory infringers. For example, a person who lawfully acquires an authorized copy of a motion picture would be an infringer if he or she engages in the business of renting it to others for purposes of unauthorized public performance." H.R.Rep. No. 1476, 94th Cong., 2d Sess. 61, *reprinted in* 1976 U.S.C.C.A.N. 5659, 5674, *cited in Curb*, 898 F.Supp. at 595.

pear more closely adapted to our modern age of telefaxes, Internet communication, and electronic mail systems. The purpose behind the Copyright Act is to protect a copyright owner's right to be free from infringement in the United States. To allow an entity to curtail this right by merely directing its foreign agent to do its "dirty work" would be to hinder the deterrent effect of the statute and to thwart its underlying purpose. Because it is more closely aligned with the language, legislative history, and purpose of the statute, the Court adopts the *Curb* interpretation of Section 106 and finds that the mere authorization of infringing acts abroad constitutes direct infringement and is actionable under United States Copyright Law.

■ Having made this determination, the Court considers whether a reasonable jury could conclude that DLCMS–USA, in fact, authorized the Asian companies' actions. In light of DLCMS–USA's arguable motive and ability to control its affiliates, the Court cannot foreclose this possibility. A jury might reasonably infer that the defendant had a motive for authorizing the infringing acts, since the affiliates' use of the Software enabled the defendant to receive manifests and billing information to facilitate its consolidation ventures. McKenzie himself indicated that the Software was extremely valuable to the companies' business.[14] *See* 12/23/93 McKenzie Decl. ¶ 14. In its Answer to the Complaint, DLCMS–USA asserts as an affirmative defense that it signed the License Agreement limiting its use of the Software because it was under duress. *See* Answer to Complaint at p. 6. Furthermore, during oral argument, defense counsel admitted that DLCMS–USA continued to use the Software after November 15, 1993 at the insistence of its customers. Finally, the fact that the defendant negotiated to use the Software during a transition period suggests that the defendant continued to need the Software, even after the license had expired.

In addition to motive, a jury might reasonably infer that the defendant had the ability to authorize the alleged infringing acts, ow-

ing to its close interaction with the affiliates. To prove this point, EI calls attention to the joint business dealings, the mutual agency agreements, and the shared profits, leadership, and ownership among the Asian companies and the defendant. Furthermore, it points to the defendant's own characterization of itself and its Asian affiliates as a "family of companies."

In light of the defendant's possible motive and power to authorize its affiliates to use the Software, the Court cannot, as a matter of law, find that the defendant did not direct its affiliates' actions. For this reason, the Court rejects the defendant's extraterritoriality argument.

### b. *Infringement of Container Manifests.*

EI accuses the defendant of infringement through: "(1) its receipt and generation by telecopier of . . . shipping manifests . . . [created by the Software], (2) its use of those shipping documents to compute the appropriate billing amounts and prepare invoices and (3) its forwarding copies of the manifests and related documentation to the customers." Brief in Opposition to the Defendant's Motion for Summary Judgment of No Copyright Infringement at p. 16. In support of its extraterritoriality argument, the defendant argues that its use of the manifests in New Jersey does not bring the plaintiff's infringement claim within this Court's jurisdiction. Specifically, it asserts that the manifests are not themselves protected materials because EI failed to register a separate copyright for the manifests and because EI's allegations concerning the manifests are untimely. *See* Reply Brief of Defendant in Support of its Motion for Summary Judgment of No Copyright Infringement at pp. 1–7. These objections are misplaced.

Because the Court finds that the mere authorization of infringing acts abroad constitutes direct infringement liability, it need not determine the copyright status of the manifests to reject the defendant's extraterritori-

---

14. McKenzie declared that he signed the June 1993 Agreement to permit DLCMS–USA's continued use of the Software; "if I refused to sign this document, DLCMS–Taiwan . . . would immediately withdraw from the DLCMS family and

withhold further support of the computer systems. Such action would completely disrupt, if not completely destroy, the company." 12/23/93 McKenzie Decl. ¶ 14.

ality argument. As discussed, the manifests are relevant to EI's infringement claim because they evidence the Asian companies' use of allegedly copyrighted materials. In turn, the defendant's business motive to use these manifests, as well as its arguable control over the affiliates, raise a genuine issue of material fact as to whether it, in fact, authorized the acts of infringement.

### c. The Exception Under Section 117 of the Copyright Act.

■ The defendant claims that the Asian companies' use of the Software was permissible under 17 U.S.C. § 117 of the Copyright Act, since CMS–Taiwan voluntarily delivered the Software to the Asian companies.[15] In making this argument, the defendant interprets Section 117 to permit lawful possessors of materials to copy and distribute the materials, even if they are protected by copyright. *See* Transcript of 1/5/98 Proceedings at p. 21; Defendant's Brief in Support of Summary Judgment of Plaintiff's Claim for Copyright Infringement at p. 13.

The defendant fails to consider the limited scope of Section 117, which is evidenced by the legislative history surrounding its enactment. The Final Report of the National Commission on New Technological Uses of Copyright Works ("CONTU Report"), which concerns the 1980 amendment of this Section, provides:

> The placement of a work into a computer is the preparation of a copy ... One who rightfully possesses a copy of a program, therefore, should be provided with a legal right to copy it *to that extent which will permit its use by that processor.* This would include the right to load it into a computer ...

The CONTU Report at p. 31 (emphasis supplied), *cited in Atari, Inc. v. JS & A Group, Inc.,* 597 F.Supp. 5, 9 (N.D.Ill.1983).

Courts examining this legislative history have interpreted Section 117 to permit copying for the limited purpose of providing rightful possessors with access to programs for internal use.[16] *See, e.g., Apple Computer, Inc. v. Formula International, Inc.,* 594 F.Supp. 617, 621–22 (C.D.Cal.1984); *Micro–Sparc, Inc. v. Amtype Corp.,* 592 F.Supp. 33, 35 (D.Mass.1984). In *Apple Computer Inc.,* Apple alleged that the defendant, a computer vendor, infringed on its copyright by distributing diskette copies of Apple software along with its computer kits to customers. 594 F.Supp. 617. Even though the defendant lawfully possessed the Apple software, the Court rejected the argument that its copying and use of the software was exempt under Section 117. *Id.* at 622. The court reasoned that the defendant's use was not limited to "internal use," since the defendant was not copying the software merely to access it on its own computer. *Id.; see also Micro–Sparc, Inc. v. Amtype Corp.,* 592 F.Supp. 33 (typing computer programs from directions in a magazine and subsequently selling the programs to third parties is not exempt under Section 117 because such copying is not limited to internal use).

In light of both the legislative history and caselaw concerning Section 117, the Court finds that the Asian companies' alleged use of the Software clearly does not fall within the ambit of the exception. The plaintiff alleges that the Asian companies, in conjunction with the defendant, generated, transmitted, and used manifests created by the Software to provide billing information to customers. For the purposes of Section 117, this application transcends mere internal use because it was not necessary for the Asian companies to access the Software in their own computers.

Because the plaintiff creates a genuine issue of material fact as to whether the Asian companies, in concert with the defendant,

---

**15.** Section 117 provides, in relevant part:
> Notwithstanding the provisions of section 106, it is not an infringement for the owner of a copy of a computer program to make or authorize the making of another copy or adaptation of that computer program provided:
> (1) that such a new copy is created as an essential step in the utilization of the computer program in conjunction with a ma-

chine and that it is used in no other manner ...

17 U.S.C. § 117 (1996).

**16.** Under Section 117(2), which is not relevant to the facts of this case, one who possesses copyrighted materials may copy or adapt the materials for merely archival purposes. *See* 17 U.S.C. § 117(2).

continued to use the Software for billing purposes, and because these alleged activities do not fall within the exception provided in Section 117, the defendant's motion for summary judgment of plaintiff's copyright infringement claim is denied.

### III. Trade Secret Misappropriation.

 Plaintiff alleges that the defendant, in conjunction with its Asian affiliates, misappropriated its trade secret by copying and continuing to use the Software after the expiration of the License Agreement. New Jersey caselaw defines a trade secret as a "formula, process, device or compilation which one uses in his business and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *See Rohm and Haas Co. v. Adco Chemical Co.*, 689 F.2d 424, 431 (3rd Cir.1982); *Sun Dial Corp. v. Rideout*, 16 N.J. 252, 257, 108 A.2d 442 (1954). To assert a trade secret misappropriation claim, the subject matter of the purported trade secret must not be a matter of public knowledge or of general knowledge within the industry. *Rohm and Haas Co.*, 689 F.2d at 431; *Sun Dial Corp.*, 16 N.J. at 257, 108 A.2d 442.

The Court finds that EI raises a genuine issue of material fact concerning the above criteria. The defendant concedes, for the purposes of this motion, that it is possible for the plaintiff to make out a claim for trade secret misappropriation relating to the underlying ideas and concepts of the Software. *See* Defendant's Brief in Support of Summary Judgment of No Trade Secret Misappropriation at p. 5. Furthermore, as discussed, one might reasonably infer that the Software was a valuable business tool for the defendant, in light of McKenzie's admissions, the defendant's duress defense, and its need for the sixty day transition period. Finally, the plaintiff's refusal to reveal the Software's source code, as well as the existence of confidentiality agreements, satisfies the Court that both EI and its predecessor, CMS–Taiwan, strove to keep the Software confidential.

While, for the purposes of this motion, the defendant does not contest these issues, it seeks summary judgment on essentially two grounds. Firstly, it urges the Court to grant its motion pursuant to Section 301(a) of the United States Copyright Act, which preempts state claims founded solely on allegations of copyright infringement. Secondly, the defendant argues that, even if the Court determines that EI's claim survives preemption because it alleges a breach of confidentiality, there is insufficient proof that DLCMS–USA has breached such a duty.

### a. Preemption under the Copyright Act.

The defendant argues that EI's trade secret misappropriation claim is preempted because it is duplicative of its claim for copyright infringement. Under Section 301(a) of the Copyright Act, state law is preempted when it grants copyrightable subject matter protection that is equivalent to the protection afforded by § 106 of the Act. 17 U.S.C. §§ 106, 301(a) (1996).

It is well established that computer programs fall within the subject matter of copyright. *See, e.g., Apple Computer Inc. v. Franklin Computer Corp.*, 714 2d 1240 (3rd Cir.); *National Car Rental System, Inc. v. Computer Associates Int'l, Inc.*, 991 F.2d 426, 431 (8th Cir.1993); *Computer Associates Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 702 (2d Cir.1992); *Architectronics, Inc. v. Control Systems, Inc.*, 935 F.Supp. 425, 438 (S.D.N.Y. 1996). Therefore, in considering the preemption argument, the Court focuses on whether EI's trade secret misappropriation claim seeks to protect rights equivalent to the exclusive copyright rights.

 Section 301(b) of the Copyright Act states:

Nothing in the title annuls or limits any rights or remedies under the common law or the statutes of any State with respect to ... activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 ...

17 U.S.C. § 301(b)(3). Consequently, under Section 301(b), a copyright claim does not preempt a misappropriation claim where "[a]n extra element is required instead of or in addition to the acts of reproduction, performance, distribution or display, in order to constitute a state-created cause of action ... A state law claim is not preempted if the

extra element changes the nature of the action so that it is qualitatively different from a copyright infringement claim." *Ez–Tixz, Inc. v. Hit–Tix, Inc.*, 919 F.Supp. 728 (S.D.N.Y.1996) (quoting *Computer Associates Int'l v. Altai, Inc.*, 982 F.2d 693, 716 (2d Cir.1992)).

For example, while Section 301 preempts a state law claim of unfair competition founded solely on the defendant's use of copyrighted materials, *Computer Associates Int'l*, 982 F.2d at 719, a claim which involves an extra element, such as a breach of a confidential relationship, renders that cause of action qualitatively different from the rights protected by the Copyright Act. *Id.* at 717; *see also Gates Rubber Co. v. Bando Chemical Industries, Ltd.*, 9 F.3d 823, 847 (10th Cir. 1993) (copyright claim for wrongful use of a computer program does not preempt a trade secret misappropriation claim where the defendant gained access to the program through a former employee of the plaintiff who breached his duty of confidentiality); *Ez–Tixz, Inc.*, 919 F.Supp. at 738 (no preemption where plaintiff not only alleges that the defendants displayed, publicized, and distributed its copyrighted program, but that they did so in violation of an agreement to keep the trade secrets within the program confidential).

The defendant contends that EI's claim does not satisfy this "extra element" test. DLCMS–USA argues that, although the plaintiff alleges that DLCMS–USA violated the License Agreement, plaintiff fails to allege that it violated any duty of confidentiality toward the plaintiff.[17] *See* Defendant's Brief in Reply for Summary Judgment of No Trade Secret Misappropriation at p. 10.

The plaintiff's Complaint alleges that, "in connection with [the] agency agreement" between CMS–Taiwan and DLCMS, CMS–Taiwan granted DLCMS a limited license to use the Software. *See* Complaint ¶ 12. This license "allowed defendant to utilize the Software in supporting deliveries to clients ... and was expressly limited to this purpose and prohibited its use for other purposes or its dissemination to employees, staff or third

parties." *Id.* The Complaint alleges that, despite the expiration of the license, "[DLCMS] continues ... to utilize the Software." *Id.* ¶ 15. Furthermore, according to the Complaint, the plaintiff and CMS–Taiwan "have always treated the Software as confidential, controlled and limited its licensing use and [have] not released the source code to any third parties." Complaint at ¶ 10. The plaintiff alleges that the Software gave it a competitive advantage in the service and retention of clients, *id.* ¶ 11, and that "defendant ... us[ed] the Software to secure its relationships with ... customers and collect fees that rightfully belong to plaintiff." *Id.* ¶ 18. In its Fourth and Fifth Counts, plaintiff seeks relief for trade secret misappropriation: "Defendant's acts constitute a misappropriation of plaintiff's trade secrets." *Id.* ¶ 32; *see also* Brief in Opposition at pp. 14–20.

Pleadings should not be narrowly construed with regard to claims of trade secret misappropriation. The legislative history of Section 301 provides that "[t]he evolving common law rights of ... trade secret ... would remain unaffected as long as the causes of action contain elements, such as ... a breach of trust or confidentiality, that are different in kind from copyright infringement ... '[m]isappropriation' is not necessarily synonymous with copyright infringement." House Report at 5748, *cited in Computer Associates Int'l*, 982 F.2d at 717.

The Second Circuit examined this legislative history of Section 301 in *Computer Associates Int'l*, which involved a software company's alleged copying of plaintiff's computer program. 982 F.2d 693. The Court rejected the argument that plaintiff's misappropriation claim was preempted merely because the plaintiff alleged both copyright infringement and misappropriation in its Complaint. *See Computer Associates Int'l*, 982 F.2d at 719–20. The Court found that the circumstances surrounding the case rendered the plaintiff's misappropriation claim substantively different from its infringement claim. *Id.* at 720.

---

**17.** "... EI *agreed* with DLCMS, stating that 'Section 301 preempts a state law claim of unfair competition predicated *solely* on defendant's use of a plaintiff's computer software ...' But that is *exactly* what EI has asserted, and that is *all* EI has asserted." Defendant's Brief in Reply for Summary Judgment of No Trade Secret Misappropriation at p. 10.

In making this determination, the Court examined the factual allegations of the Complaint, which involved a former employee's misappropriation of software information and the defendant competitor's reckless use of the information. *Id.* at 719–20. The Court further looked to the plaintiff's briefs, which suggested that the defendant hired the former employee to misappropriate confidential information. *Id.* at 720.

As in *Computer Associates Int'l*, EI's allegations and arguments sufficiently assert a breach of confidentiality claim. · The Complaint alleges that the defendant and Asian companies entered into a License Agreement with the plaintiff which limited the use of the Software. It alleges that the plaintiff strove to keep the Software's source code confidential. Furthermore, the Complaint alleges that the defendant used this secret information in violation of the agreement, and that this use prejudiced the plaintiff. Finally, the plaintiff devotes approximately one-third of its brief to a discussion concerning breach of confidentiality. In light of these arguments, the allegations within its Complaint, and the legislative history behind Section 301, the Court finds that the plaintiff adequately sets forth a breach of confidentiality claim. Because the plaintiff's trade secret misappropriation claim contains this "extra element," it survives preemption under Section 301.

### b. DLCMS–USA's Liability for Trade Secret Misappropriation.

The defendant argues, in the alternative, that even if the Court interprets the claim to allege a breach of confidentiality, there is insufficient evidence that the defendant breached any such duty toward EI. New Jersey courts analyze trade secret misappropriation claims by relying on the confidentiality principles set forth in the Restatement Third of Unfair Competition. *See, e.g., Sun Dial Corp.*, 16 N.J. at 257, 108 A.2d 442; *Hammock By Hammock v. Hoffmann–La-Roche, Inc.*, 142 N.J. 356, 384, 662 A.2d 546 (1995). Section 41 of the Restatement Third of Unfair Competition provides, in relevant part:

A person whom a trade secret has been disclosed owes a duty of confidence to the owner of the trade secret . . . if:

(a) the person made an express promise of confidentiality prior to the disclosure of the trade secret; or

(b) the trade secret was disclosed to the person under circumstances in which the relationship between the parties to the disclosure or the other facts surrounding the disclosure justify the conclusions that, at the time of the disclosure,

(1) the person knew or had reason to know that the disclosure was intended to be in confidence, and

(2) the other party to the disclosure was reasonable in inferring that the person consented to an obligation of confidentiality.

Restatement (Third) of Unfair Competition § 41.

The defendant contends that it is not liable under Section 41 of the Restatement for two reasons. Firstly, it argues that it should not be liable for the Asian companies' alleged breach of confidentiality agreements.[18] Secondly, it asserts that its direct use of the manifests was not a violation of the License Agreement or its duty of confidentiality toward the plaintiff.

### 1. Indirect Liability for the Asian Companies' Alleged Breach of Confidentiality.

When one corporation acts as the agent of a disclosed principal corporation, the latter corporation may be liable on contracts made by the agent. *Phoenix Canada Oil Co. v. Texaco, Inc.*, 842 F.2d 1466, 1477 (3rd Cir.1988) (citing Restatement (Second) of Agency § 144 (1958)). To hold a principal liable for the acts of its subsidiaries under general agency law, total domination over the subsidiary need not be proven. *Phoenix Canada Oil Co.*, 842 F.2d at 1477; *Royal*

---

**18.** For the purposes of this motion, the defendant does not contest that the Asian companies used the Software despite their confidentiality agreements with the plaintiff. During oral argument, defense counsel stated that "... at the very least

the plaintiff could raise a genuine issue of fact ... based upon th[e] similarity [between the Software's source code and the container manifests] as to whether the Asian companies actually ran the software." 1/5/98 Transcript at p. 15.

*Industries Ltd. v. Kraft Foods, Inc.*, 926 F.Supp. 407, 412 (S.D.N.Y.1996). However, there must be "a relationship between the corporation and the cause of action. Not only must an arrangement exist between the two corporations so that one acts on behalf of the other and within the usual agency principles, but the arrangement must be relevant to the plaintiff's claim of wrongdoing." *Phoenix Canada Oil Co.*, 842 F.2d at 1477; *Royal Industries Ltd.*, 926 F.Supp. at 412.

In *Phoenix Canada Oil Co.*, the Third Circuit remanded a case because the district court failed to explore customary agency principles to determine whether a parent company could be liable for its subsidiary's breach of a royalties contract. 842 F.2d 1466. The Court found that the relationship among the parties was relevant to the plaintiff's claim after noting that the principal drafted the contract in dispute, that it participated in the business dealings of its subsidiary, and that the two entities shared several officers and directors. *Id.; see also Royal Industries Ltd. v. Kraft Foods, Inc.*, 926 F.Supp. 407 (under general agency principles, a coffee distributor may be liable for the breach of a contract that was negotiated by its subsidiary).

 The defendant argues that it cannot be liable for the Asian companies' alleged breach of confidentiality because: (1) it did not control the Asian companies' actions; and (2) its relationship with the companies bears no connection to the plaintiff's cause of action.[19] Firstly, as explained in the Court's discussion of copyright infringement, the nature of the defendant's relationships with and control over the affiliates remains a factual question for a jury to decide. Because the self-characterized "family of companies," jointly participated in freight dealings and shared both stock ownership and employees, this Court cannot find, as a matter of law, that the defendant did not act as a principle to influence or control the business practices of its affiliates.

Secondly, the defendant's contention that its relationship with the affiliates bears no connection with EI's claims runs contrary to

its own admissions. The President of DLCMS–USA has represented that the very reason the companies initially became affiliated with one another was "to use the emerging technology of personal computers and telecommunications in Ocean Cargo consolidation services ..." 12/23/93 McKenzie Decl. ¶ 7. The mutual agency agreements between the companies provide that only customers who subscribed to the services of both the defendant and the Asian affiliates received access to the Software. *See id.* ¶ 8. Furthermore, McKenzie stated that "it had always been our belief and understanding that all companies were joint owners of the software which had been developed for all our mutual benefit over the years." *Id.* ¶ 14.

In light of the relationships between the companies, as well as the nexus between these relationships and the plaintiff's claim, a reasonable fact-finder may hold the defendant liable for the acts of its affiliates under general agency law. The Court, therefore, denies the defendant's motion for summary judgment on the plaintiff's trade secret misappropriation claim.

### 2. *Direct Liability for the Defendant's Use of Manifests.*

The defendant argues that it should not be liable for trade secret infringement owing to its use of the manifests. Specifically, it contends that the manifests are not a trade secret since the plaintiff made no attempt to secrete the manifests from the public. *See* Brief in Reply for Summary Judgment of No Trade Secret Misappropriation at pp. 12–14. Again, this argument is misplaced.

Because there is a genuine issue of material fact as to whether DLCMS–USA is liable for the misappropriation of its affiliates, the Court need not determine if the manifests themselves constitute a trade secret. As in its Motion for Summary Judgment of No Copyright Infringement, the defendant defends its use of the manifests themselves, while failing to address the manifests' significance to the underlying claim. The similarities between the manifests and the source

---

**19.** "EI points to no nexus between its trade secret claim ... and the very limited 'agency' which exists between DLCMS and the Asian affil-

iates." Defendant's Reply Brief in Support of its Motion for Summary Judgment of No Trade Secret Misappropriation Claim at p. 7.

code are relevant because they suggest that the Asian companies breached their duty of confidentiality toward the plaintiff. In turn, the defendant's close relationship with these companies, and its subsequent receipt and use of the manifests suggest that it worked in concert with the affiliates when they allegedly breached their duty of confidentiality toward EI. These facts preclude the summary judgment of plaintiff's trade secret misappropriation claim.

## IV. Breach of Contract.

The defendant asserts essentially two arguments in support of its Motion for Summary Judgment of No Breach of Contract. Firstly, it argues that the state claim is preempted under Section 301 of the Copyright act, since no promise or agreement between the parties existed regarding the Software. Secondly, it contends that, even if the claim survives preemption because there was a promise between the parties, there is insufficient proof that DLCMS–USA has breached any such promise.

### a. Preemption.

In its Motion for Summary Judgment of No Breach of Contract, DLCMS–USA again argues that Section 301 preempts the plaintiff's state law claim. EI counters that its breach of contract claim contains an extra element precluding preemption, since the defendant breached a promise that existed between the parties. Again, pursuant to Section 301 of the Copyright Act, the Court examines whether EI's breach of contract claim seeks to protect rights different from or in addition to the exclusive copyright rights.

 Protection from breach of contract is not equivalent to copyright protection, since "a breach of contract claim requires an 'extra element' that renders the claim qualitatively different from a claim for copyright infringement: a promise by the defendant." *Architectronics, Inc. v. Control Systems, Inc.*, 935 F.Supp. 425, 439 (S.D.N.Y.1996). In *Architectronics, Inc.*, a software development firm sued two former joint venturers on a number of claims, including breach of contract and copyright infringement. 935 F.Supp. 425. The defendants argued that Section 301 preempted the plaintiff's breach of contract claim. *Id.* In considering the difference between rights protected by contract and rights protected by copyright, the Court relied upon the relevant words of Judge Easterbrook of the Seventh Circuit:

> Rights 'equivalent to any of the exclusive rights within the general scope of copyright' are rights established by law—rights that restrict the options of persons who are strangers to the author. Copyright law forbids duplication, public performance, and so on, unless the person wishing to copy or perform the work gets permission; silence means a ban on copying. A copyright is a right against the world. Contracts, by contrast, generally affect only their parties; strangers may do as they please, so contracts do not create 'exclusive rights.'

*Id.* at 439 (citing *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1454 (7th Cir.1996)). The Court concluded that, because the defendant signed a confidentiality memorandum and license agreement containing its promise not to disclose protected materials, the plaintiff's breach of contract claim satisfied the "extra element" test. *See id.* at 429.

 The Courts of Appeals that have addressed this issue have also found that the rights protected in breach of contract claims are not duplicative of copyright rights. *See, e.g., ProCD, Inc.*, 86 F.3d 1447; *National Car Rental Sys., Inc. v. Computer Associates Int'l*, 991 F.2d 426 (8th Cir.), *cert. denied*, 510 U.S. 861, 114 S.Ct. 176, 126 L.Ed.2d 136 (1993); *Taquino v. Teledyne Monarch Rubber*, 893 F.2d 1488 (5th Cir.1990). In these cases, each Court of Appeals found that the alleged breach of a promise or agreement between the individual parties constitutes the "extra element" necessary to preclude preemption. *Id.*

The defendant contends that EI's claim has no "extra element" because it merely alleges that the defendant violated a license, as opposed to a promise. DLCMS–USA argues that the June 29, 1993 License Agreement constituted the extent of its agreement with EI, and that "[this] license provided DLCMS with a defense to an infringement action while the 'license' was in effect. But once the purported 'license' 'expired,' any purported use of EI's Software was simply unlicensed usage of same, which is actionable

... as infringement." Defendant's Brief in Support of Summary Judgment of No Breach of Contract at pp. 11–12. EI counters that its claim rests on a series of promises that existed between the parties, including but not limited to the 1993 License Agreement. It asserts that the License Agreement merely "memorialized" the underlying agreements that had developed between the parties before September, 1993. Complaint ¶ 12.[20]

A reasonable jury could easily conclude that the parties did not limit the terms of their agreement to the five sentences contained within the License Agreement. McKenzie himself admitted that a sixty day Transition Agreement existed among the parties. McKenzie also admitted that the companies became affiliated as early as 1983, and that they based their affiliation on the continuing development and use of the Software. DLCMS–USA's counsel represented in correspondence that "the proposed Software License Agreement goes well beyond the scope of U.S. copyright law." 11/23/93 Hamilton Correspondence, Yunker Aff.Ex. C. The License Agreement itself provides that wrongful use of the Software "is an infringe-ment of copyright and may result in civil liability or criminal prosecution as provided by law." 6/23/93 License Agreement, Yunker Aff.Ex. B. Finally, confidentiality agreements dated 1991 and 1993 existed between CMS–Taiwan and the Asian affiliates.[21]

### b. The Alleged Breach.

■ Having rejected the defendant's preemption argument, the Court considers the defendant's alternative argument that there is insufficient proof that DLCMS–USA has breached any promise. The Court finds that there is ample evidence from which a jury could conclude that it has breached an agreement. The defense counsel admitted that the defendant used the Software after the transition period. Furthermore, counsel represented that DLCMS–USA would pay royalties for this continued use. The DLCMS–USA's system supervisor admitted that the billing procedures did not change after the License Agreement expired. As discussed, the jury could reasonably impute the Asian companies' continued use of the Software, as evidenced by the similarities between their manifests and the source code, to the defendant.[22] Finally, as discussed, the defendant

---

**20.** DLCMS–USA urges the Court to preclude EI from referencing any additional agreements at this time, since the allegations in its Complaint involve solely the License Agreement. *See* Reply Brief for Summary Judgment of No Breach of Contract at p. 4. The Court rejects this argument in light of Paragraphs 12 and 14 of the Complaint, which allude to broader agreements between the parties. Paragraph 12 alleges that "[p]rior to ... September 15, 1993 ... CMS Taiwan utilized defendant ... as its agent ... In connection with this agency agreement, defendant was licensed to use the Software by CMS Taiwan. This license was memorialized pursuant to an agreement dated on or about June 29, 1993 ..." Paragraph 14 discusses the separate Transition Agreement that existed between the parties. *See* Complaint ¶¶ 12, 14.

**21.** The defendant asserts that it should not be held to the terms of agreements that existed between its Asian affiliates and EI. For reasons discussed, the Court finds that this is a factual issue that a jury should determine after examining evidence concerning the companies' relationships with one another.

**22.** Once again, the defendant objects to EI's allegations concerning the manifests. DLCMS–USA argues that the plaintiff cannot base its breach of contract claim on the defendant's use of the manifests, because the License Agreement did not prohibit this use. *See* Defendant's Brief in Support of Summary Judgment of No Breach of Contract at p. 12 ("DLCMS simply never agreed that it would turn off its fax in the event an Asian affiliate transmitted a container manifest which was later argued to have been produced with the so-called Asia-origin programs").

This argument is both inaccurate and irrelevant. It is inaccurate because, in fact, the License Agreement forbade the defendant to make "[a]ny other use of these programs, including ... any of the screen format." The License Agreement, Yunker Aff.Ex. B.

At any rate, the argument is irrelevant since, as discussed, the plaintiff does not seek relief for the defendant's use of the manifests themselves. Instead, plaintiff seeks relief for the defendant's alleged collaboration with its affiliates to circumvent the contract, as evidenced by the manifests. *See* Plaintiff's Brief in Opposition of Summary Judgment of No Copyright Infringement at p. 11; Transcript of 1/5/98 Proceedings at pp. 38–39. Again, the format of the manifests suggests that the Asian affiliates improperly used the Software. In turn, the defendant's arguable ability to control its affiliates' actions, coupled with its possible motive to use the manifests, suggest that the defendant acted in concert with the affiliates to use the Software and to continue its billing and freight practices as it had before the license expired.

had an arguably strong motive to use the Software to the benefit of its consolidation business. Because a jury might reasonably conclude that the defendant, in conjunction with its Asian affiliates, broke a promise by using EI's Software, the defendant's motion for summary judgment is denied.

### CONCLUSION.

For the foregoing reasons, the defendant's motions for summary judgment of plaintiff's copyright infringement, trade secret misappropriation, and breach of contract claims are hereby denied.